**SOUTHERN PACIFIC COMPANY, a corporation of the State of Delaware**

v.

**MILLER ABATTOIR COMPANY, a corporation of the State of New Jersey, Appellant.**

No. 19516.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) Nov. 30, 1971.

Decided Jan. 12, 1972.

358

Solomon Lubow, Jersey City, N. J., for appellant.

Jerome J. Graham, Jr., Carpenter, Bennett & Morrissey, Newark, N. J. (Carpenter, Bennett & Morrissey, John E. Patton, Newark, N. J., on the brief), for appellee.

Before KALODNER, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

The plaintiff, Southern Pacific Company (hereinafter the "Railroad"), a Delaware corporation, is a common carrier engaged in the railway transporta-

tion of property in interstate commerce. The defendant, Miller Abbatoir Company (hereinafter the "Consignee") is a New Jersey corporation engaged in the slaughtering business.

In April and May, 1964, the Railroad transported twenty-one shipments of lambs from Arizona to the Consignee's slaughterhouse in New Jersey. These lambs had been purchased by the Consignee from an Arizona livestock company.

En route to New Jersey, each of the shipments was detained at Tucson, Arizona, by federal inspectors. This stoppage was required by § 83.7(a) of the Western Trunk Line Committee Freight Tariff 362–D,[1] which forbade rail shipment of livestock from Arizona unless the livestock had been inspected and found to be free of screw worms. Because of the inspection, the Railroad incurred expenses for switching, unloading, reloading, and returning the lambs to its shipping facilities. The Railroad charged the Consignee for these expenses, and upon the Consignee's refusal to pay, this action was commenced. The District Court took jurisdiction of the action under 28 U.S.C.A. § 1337.[2]

The Consignee alleged, both as a defense to the Railroad's claim and as a counterclaim, that it had suffered damages as a result of the Railroad's failure to give immediate notice of the stoppage for inspection as called for by the shipping contract.

The Railroad and the Consignee both moved for summary judgment on the Railroad's claim. The Consignee moved for summary judgment on its counterclaim. The District Court granted the Railroad's motion and entered judgment for the Railroad on its claim for freight charges. On the counterclaim, the District Court denied the Consignee's motion for summary judgment and entered judgment for the Railroad. From these orders the Consignee appeals.

I

Initially, it is settled law that one who accepts goods consigned to him is liable for all freight charges properly due under the applicable tariffs. Pittsburgh, C., C. & St. L. Ry. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919); New York Central & H. R. R.R. v. York & Whitney Co., 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016 (1921); Louisville & N. R.R. v. Central Iron & Coal Co., 265 U.S. 59, 70, 44 S.Ct. 441, 68 L. Ed. 900 (1924). Under § 6(7) of the Interstate Commerce Act, 49 U.S.C.A. § 6(7),[3] carriers are forbidden to charge any rate different from the tariff rate. As a corollary, an accepting consignee owes the full tariff charge despite initial misquotation or miscalculation of freight charges by the carrier. A contract to carry for less than tariff rates is void and will not prevent recovery of tariff rates. It is the carrier's duty as well as its right to enforce payment of full tariff charges: Even though the results may be harsh in individual cases, this strict construction of the statute has been thought necessary to effectuate its purpose to secure uniform treatment

---

1. 9 C.F.R. § 83.7(a) (Jan. 1, 1964).

2. 28 U.S.C.A. § 1337 (1962) reads in relevant part:
   "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ."

3. 49 U.S.C.A. § 6(7) (1959) reads in relevant part:
   "[N]or shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

of shippers and to prevent discrimination and favoritism by carriers.[4]

■ In this case, the lambs were shipped under Transcontinental Freight Bureau Freight Tariff 52–J, Item 385(7) of which provided:

"All expense accruing at the stopping points, such as charges for unloading, loading, bedding, feeding, yardage, switching charges, dipping, inspection and other charges to be in addition to the through rate."

Under this provision of the tariff, the Consignee became liable upon accepting the lambs for all charges incurred by the Railroad in the stoppage for inspection.[5]

## II

The Consignee attempted below to set off against the freight charges damages suffered through the Railroad's failure to give immediate notice of the stoppage for inspection. The Railroad argues that, even if its failure were a breach of the shipping contract, to allow recovery of damages for the breach would offend 49 U.S.C.A. § 6(7). That is, an unscrupulous railroad could purposely neglect to give the immediate notice called for by the contract and thus give a disguised rebate to the customer so favored. The District Court apparently upheld the Railroad's argument in entering judgment for the Railroad on the counterclaim.

This argument was rejected by the Supreme Court, however, in Chicago & N. W. Ry. v. Lindell, 281 U.S. 14, 50 S. Ct. 200, 74 L.Ed. 670 (1930). In that case, a railroad's action for freight charges was met by the shipper's counterclaim for damages caused to the ship-

ment of grapes by the railroad's unreasonable delay and its failure to keep the shipment properly iced. In upholding the counterclaim, the Court stated:

"It is well understood that payment by carriers to shippers under the guise of settling claims for loss and damage may in effect constitute discrimination that the act was intended to prevent. But it is not suggested how opportunity for collusion in respect of such matters would be lessened by abolishing counterclaims in cases such as this. Collusion and fraud may be practiced in the defense and settlement of separate actions brought on such claims as well as when the same matters are put forward as offsets or counterclaims." 281 U.S. at 18, 50 S.Ct. at 201.

The precise issue considered in *Lindell* was not whether § 6(7) prevented altogether the shipper's recovery of damages, but whether that section prevented their recovery by counterclaim rather than by separate action. The Court would not have reached the issue of whether § 6(7) prevented recovery by counterclaim, however, without having decided at least implicitly that § 6(7) did not prevent recovery altogether. The language quoted leaves little doubt that the Court understood the danger of disguised rebates but rejected it as a reason for denying recovery to the injured shipper.

■ The Railroad's argument overlooks the fact that a customer who is truly damaged by a railroad's breach of its shipping contract, whether the breach be intentional or not, receives no "rebate" when the railroad pays it the amount of its loss. It would not be the

---

4. These propositions are amply supported by Louisville & N. R.R. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915) ; Pittsburgh, C., C. & St. L. Ry. v. Fink, *supra* ; New York Central & H. R. R.R. v. York & Whitney Co., *supra* ; Keogh v. Chicago & N.W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) ; Louisville & N. R.R. v. Central Iron & Coal Co., *supra* ; Baldwin v. Scott Coun-

ty Milling Co., 307 U.S. 478, 59 S.Ct. 943, 83 L.Ed. 1409 (1939).

5. It was also provided in the shipping contract that "[q]uarantine expenses . . . shall be borne by the owners of the property. . . . " The discussion above should make clear, however, that the Consignee's liability is based solely on the tariff and not on this contract provision.

fact of paying damages, but the over-payment of damages, that would constitute the unlawful "rebate". The fact that a railroad might seek to evade laws forbidding rebates through such a subterfuge is not sufficient to warrant denial of damages to those customers of railroads who suffer through some breach of duty by the railroad.[6] Indeed, the Railroad's argument does not take account of § 20(11) of the Interstate Commerce Act, 49 U.S.C.A. § 20(11) (1951), which makes interstate common carriers liable for any loss, damage, or injury that they cause to property carried by them. The existence of that section is inconsistent with the argument that the policy expressed in § 6(7) is sufficiently strong to warrant denial of damages merely because of the potential for abuse.

If the Consignee in this case has suffered damages through the Railroad's breach of the shipping contract, 49 U.S.C.A. § 6(7) does not stand in the way of recovery.

### III

Whether there was in fact a breach of the shipping contract depends upon the construction of the following sentence

6. In addition to Chicago & N.W. Ry. v. Lindell, *supra, see* Pennsylvania R.R. v. Musante-Phillips, Inc., 42 F.Supp. 340 (N.D.Cal.1941); Norton v. Shotmeyer, 72 F.Supp. 188 (D.N.J.1947); Railway Express Agency v. Smith, 116 F.Supp. 609 (E.D.S.C.1953); Reading Co. v. Commodity Credit Corp., 181 F.Supp. 359 (E.D.Pa.1960), rev'd on other grounds, 289 F.2d 744 (3rd Cir. 1961); *cf.* Fort Worth & D.C. Ry. v. F. Burkart Mfg. Co., 56 F.Supp. 159 (E.D.Mo.1944), aff'd, 149 F.2d 909 (8th Cir. 1945).

7. Each of the contracts stated: "It is mutually agreed . . . that every service to be performed and every liability incurred in connection with said shipment shall be subject to all the conditions, whether printed or written, herein contained, including the conditions on back hereof. . . . "
   On the back of the contract forms, Section 1(c) of the "Contract Terms and Conditions" stated, in pertinent part:

printed on the back of the "Uniform Live Stock Contract" and incorporated[7] as a part of it:

> "In case a shipment is stopped in transit by quarantine, the carrier shall immediately give notice of such fact to the shipper or consignee."

For purposes of its motion for summary judgment, the Railroad's counsel stipulated that the Railroad had taken no action at the time of stoppage to inform the Consignee or the shipper. The Railroad's position at all times has been that the notice requirement was satisfied by publication in the Federal Register of Part 83 of the Western Trunk Line Committee Freight Tariff 362–D,[8] which stated explicitly that screw worms existed in Arizona and that livestock leaving that state would be stopped for inspection.[9]

The Railroad's position, however, takes little account of the language of the contract provision. The words "shall immediately give notice" imply that the provision contemplated some action on the part of the Railroad to inform the shipper or consignee that the shipment had been stopped. It is a strained interpretation to read these words as requiring only that there be legal notice through publication.

> "In case of quarantine, the livestock may be discharged at risk and expense of owners into quarantine depot or elsewhere as required by quarantine regulations or authorities, or for the carrier's dispatch, or at nearest available point in carrier's judgment, and in any such case carrier's responsibility shall cease when the property is so discharged, or the property may be returned by carriers at owner's expense to shipping point, earning freight both ways. Quarantine expenses of whatever nature or kind upon or in respect to the property shall be borne by the owners of the property or be a lien thereon. In case a shipment is stopped in transit by quarantine, the carrier shall immediately give notice of such fact to the shipper or consignee."

8. 9 C.F.R. §§ 83.1–.18 (Jan. 1, 1964).

9. 9 C.F.R. §§ 83.2, 83.7 (Jan. 1, 1964).

Similarly, the purpose of the provision appears to be to insure that the parties most interested in the livestock in transit be informed about its status. A consignee whose livestock is in quarantine may need to know of the stoppage for a multitude of reasons. Even if he has actual knowledge that the livestock will be detained, it may be crucial to know when and where the stoppage has occurred. For these purposes, mere legal notice by publication would be useless to the consignee.

We reverse the order of the District Court entering judgment on the counterclaim for the Railroad. On remand it will be necessary to determine whether the Railroad gave the immediate notice called for by the shipping contract.

Here we hold only that the publication of tariff provisions requiring stoppage of livestock for inspection does not satisfy the immediate notice required by this contract.

### IV

An issue raised by the parties involving the Consignee's procedure in presenting its claim for damages does not require lengthy discussion. The Consignee alleged the Railroad's breach both as a defense and as a counterclaim. The alleged breach, however, does not constitute a defense to the Railroad's claim for freight charges, but constitutes an independent claim that is a proper subject for counterclaim under Rule 13, Federal Rules of Civil Procedure. The point is not critical, however, since under Rule 8(c) of the same rules:

"When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."

Because the alleged breach is no defense to the Railroad's claim, the District Court was correct in granting the Railroad's motion for summary judgment on its claim for freight charges.

### V

In entering judgment for the Railroad on its claim, the District Court included prejudgment interest in its award. The Consignee argues that such an award was improper.

Since the Railroad's claim arises under a federal statute, whether prejudgment interest will be allowed is initially a question of federal law and not the law of the forum state. See Wallis v. Pan American Petroleum Corporation, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966); 1A Moore's Federal Practice §§ 0.318, 0.323[12] (2nd ed. 1959). Here the policy expressed in 49 U.S.C.A. § 6(7) requires that prejudgment interest be awarded. Under that section, the only lawful charge for shipping the lambs is the full tariff charge. To allow the Railroad to recover without awarding prejudgment interest would be to diminish the tariff charge by an amount representing the value of the use of the money owed for the period prior to judgment. Such a diminution would be contrary to § 6(7).[10] Thus the District Court was correct in allowing prejudgment interest on the Railroad's claim.

### VI

In the event that, upon remand, it is found that the Railroad failed to give the immediate notice called for in the shipping contract, the Consignee may recover on its counterclaim any damages to which it can prove itself legally entitled. Many of the arguments contained in the parties' briefs have been directed toward the issue of damages, and there is a substantial dispute about whether the Consignee could have diverted the shipments or otherwise reduced its costs in the event that it had been given the

10. For cases in accord, see Louisiana & Ark. Ry. v. Export Drum Co., 359 F.2d 311 (5th Cir. 1966), and cases there cited. Cf. Rodgers v. United States, 332 U.S. 371, 376, 68 S.Ct. 5, 8, 92 L.Ed. 3 (1947), where the Court, in denying pre-judgment interest on penalties for violations of cotton marketing quotas, was "unable to say that it would be consistent with the congressional purpose for the courts to add interest to these very substantial penalties . . . . ."

required notice. We need not consider those arguments, since resolution of the issues will depend to a great extent upon the particular facts brought out on remand. In the light of these genuine issues as to material facts, the District Court was correct in denying the Consignee's motion for summary judgment on the counterclaim. Rule 56(e), Federal Rules of Civil Procedure.

Thus the order of the District Court will be affirmed insofar as it:

a) grants the Railroad's motion for summary judgment on its claim for freight charges;

b) denies the Consignee's similar motion;

c) enters judgment for the Railroad on its claim; and

d) denies the Consignee's motion for summary judgment on its counterclaim.

The order entering judgment for the Railroad on the counterclaim will be reversed. The case will be remanded for further proceedings in accordance with this opinion.