522 F.2d 1095
 FARLEY TERMINAL COMPANY, INC., Plaintiff-Appellant,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,
Defendant-Appellee.
Harold WILLINGER, doing business as Assembly Consolidators,
Plaintiff- Appellant,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant-Appellee.
 Nos. 74-1872, 74-2410.
 United States Court of Appeals,
Ninth Circuit.
 July 9, 1975.
 
 Ira G. Megdal, Washington, D. C., Eric K. Lewis, Fullerton, Cal., for plaintiffs-appellants.
 John J. Balluff, Los Angeles, Cal., for defendant-appellee.
 OPINION
 Before KOELSCH and GOODWIN, Circuit Judges, and WOLLENBERG,* District Judge.
 PER CURIAM:
 
 
 1
 In these separate but related actions for damages for breach of contract, Farley Terminal Co., Inc., and Harold Willinger, lessees of TOFC (trailer-on-flatcar) or "piggyback" service equipment under separate but substantially identical lease agreements with the Atchison, Topeka and Santa Fe Railway Company (the Santa Fe), appeal from the district court's granting of summary judgments in favor of the lessor railway. The question presented is whether the Santa Fe's filing of a rate tariff as required by the Interstate Commerce Commission (ICC) which tariff, when approved, imposed on lessees higher rates for the leasing of TOFC equipment than were provided in the preexisting lease agreements constitutes an actionable breach of those agreements. We conclude it does not and therefore affirm.
 
 
 2
 Briefly, the facts are these: In its decision in Ex parte 230, Substituted Service Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback Service), 322 I.C.C. 301 (1964), the ICC promulgated regulations requiring that each railroad providing TOFC service in interstate commerce publish, post, and file tariffs containing all rates and charges for the leasing of its TOFC equipment. See 322 I.C.C. at 415; 49 C.F.R. § 500.7 (1964), redesignated 49 C.F.R. § 1090.7 (1967).[1] Early in 1967, Farley and Willinger executed separate lease agreements with the Santa Fe whereby each agreed to lease trailers and flatcars from the railway on an availability basis, at rates specified in the agreements. During the following months, each was charged at those rates. However, in July, 1967, the ICC served an order on the Santa Fe and other railroads which provided TOFC service, requiring them to comply with the regulations promulgated in Ex parte 230 by filing appropriate tariffs before August 18, 1967. After obtaining a ninety-day extension, the railroads, including the Santa Fe, filed Trans-Continental Freight Bureau Freight Tariff 2-F, Supplement 41, Section 1, Item 4900-E. This tariff, which established higher rates for the leasing of TOFC equipment than were provided in the preexisting leases, became effective November 17, 1967, after the ICC approved it. Lessees were thereafter charged at the new, higher rates. They brought these actions to recover the difference between the charges they paid under the tariff and those they would have paid under their respective agreements. The district court granted summary judgments in favor of the Santa Fe and these appeals followed.
 
 
 3
 We commence with the fundamental principle that summary judgment is proper only where there is no genuine issue as to any material fact or where, viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is entitled to prevail as a matter of law. Rule 56, F.R.Civ.P. Here the district court properly granted summary judgments in favor of the railroad.
 
 
 4
 Appellants concede, as they must, that once the new tariff rates for TOFC service became effective, the Santa Fe was bound by law to charge those rates. Section 6(7) of the Interstate Commerce Act, 49 U.S.C. § 6(7), prohibits carriers in interstate commerce from receiving "different compensation . . . than the rates, fares, and charges which are specified in the tariff filed and in effect at the time." Moreover, the Elkins Act, 49 U.S.C. § 41 Et seq., provides criminal penalties for departures from the published rates, See 49 U.S.C. § 41(2), and for a carrier's returning to a shipper rebates or offsets against them, See 49 U.S.C. § 41(3).
 
 
 5
 Appellants nevertheless urge their entitlement to damages based on the variance between the tariff rates they were charged and those specified in their pre-existing agreements with the railway. We are not persuaded. It is well recognized that the principal congressional purpose in enacting the Interstate Commerce Act was to obtain a uniformity of rates and an end to discriminatory practices. As the Court early noted in New Haven Railroad Company v. I.C.C., 200 U.S. 361, 391, 26 S.Ct. 272, 277, 50 L.Ed. 515 (1906):"It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs, and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination. To this extent and for these purposes the statute was remedial and is, therefore, entitled to receive that interpretation which reasonably accomplishes the great public purpose which it was enacted to subserve."
 
 
 6
 Where, as here, a conflict exists between published tariff rates and rates enumerated in pre-existing agreements, we think it well established that the tariff rates must prevail. Were we to permit enforcement of the inconsistent contractual rates, we would significantly undercut the clear policy of the Act to secure equal rates for all, as well as condone one discriminatory situation such as the Act was intended to remedy. See, e. g., Louisville and Nashville Railroad Company v. Mottley, 219 U.S. 467, 477-486, 31 S.Ct. 265, 55 L.Ed. 297 (1911); Armour Packing Company v. United States,209 U.S. 56, 81-83, 28 S.Ct. 428, 52 L.Ed. 681 (1908); Texas and Pacific Railway Company v. Mugg, 202 U.S. 242, 245, 26 S.Ct. 628, 50 L.Ed. 1011 (1906); New Haven Railroad Company, supra, 200 U.S. at 390-393, 26 S.Ct. 272.[2] Cf. American Trucking Association, Inc. v. A., T. & S. F. R. Co.,387 U.S. 397, 406, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967).
 
 
 7
 In this connection, a tariff, rate, or charge, duly established in accordance with the Act, is the legal rate; it has the force of statute and is binding on carrier and shipper alike. See Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939); Pennsylvania Railroad Company v. International Coal Mining Company,230 U.S. 184, 196-197, 33 S.Ct. 893, 57 L.Ed. 1446 (1913); Robinson v. Baltimore and Ohio Railroad Company, 222 U.S. 506, 508-510, 32 S.Ct. 114, 56 L.Ed. 288 (1912).[3] And a contract valid when made is nevertheless rendered void by subsequently established tariff rates which are inconsistent, at least to the extent of the inconsistency. See Mottley,supra, 219 U.S. at 480-486, 31 S.Ct. 265.[4] Moreover, a shipper's knowledge of duly published tariff provisions is presumed. American Railway Express Company v. Daniel, 269 U.S. 40, 42, 46 S.Ct. 15, 70 L.Ed. 154 (1925); Kansas City Southern Railway Company v. Carl, 227 U.S. 639, 653, 33 S.Ct. 391, 57 L.Ed. 683 (1913); Chicago & Alton Railroad Company v. Kirby,225 U.S. 155, 166, 32 S.Ct. 648, 56 L.Ed. 1033 (1912); Mugg, supra, 202 U.S. at 245, 26 S.Ct. 628.[5]
 
 
 8
 Appellants' remaining contention that the Santa Fe was required under the circumstances to establish a tariff rate identical to that enumerated in its pre-existing agreements with appellants is without merit. It is well settled that a carrier is entitled to initiate rates, and to adopt such policy of rate-making as it deems wise, subject to the revisory powers conferred upon the ICC. See Diamond Tank Transport v. United States, 23 F.Supp. 497, 501 (W.D.Wash., N.D.1938) (three-judge court), Affirmed, 305 U.S. 567, 59 S.Ct. 149, 83 L.Ed. 357 (1938); United States v. Illinois Central Railroad Company,263 U.S. 515, 522, 44 S.Ct. 189, 68 L.Ed. 417 (1924). And in light of the congressional intention, already noted, that pre-existing agreements be abrogated by subsequently promulgated regulations, at least to the extent of the inconsistency, we think it clear that a carrier's decision fixing a proposed tariff rate to be charged uniformly to all should not be foreclosed by its pre-existing obligation to charge a different rate to a few.
 
 
 9
 Affirmed.
 
 
 
 *
 The Honorable Albert C. Wollenberg, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 A challenge to Ex parte 230, on grounds not relevant to this appeal, was sustained in A., T. & S. F. R. Co. v. United States, 244 F.Supp. 955 (N.D.Ill.1965) (three-judge court), and then Reversed sub nom. American Trucking Associations, Inc. v. A., T. & S. F. R. Co., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967)
 
 
 [2]
 For example, the Court observed in Armour Packing Company, supra, 209 U.S. at 81-82, 28 S.Ct. at 435 as follows:
 "It (the law regulating interstate commerce) has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be, while in force, the only legal rate. Any other construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish.
 ". . . This feature of the law, it is insisted, puts the shipper in many kinds of trade at the mercy of the carrier, who may arbitrarily change a rate, upon the faith of which contracts have been entered into, but the right to make such regulations is inherent in the power of Congress to legislate respecting interstate commerce, and such considerations of inconvenience or hardship address themselves to the law-making branch of the government. . . .
 "The statute being within the constitutional power of Congress, and being in force when the contract was made, is read into the contract and becomes a part of it.
 "If the shipper sees fit to make a contract covering a definite period, for a rate in force at the time, he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law."
 The Court further said in Mottley, supra, 219 U.S. at 482-483, 31 S.Ct. at 271:
 "The agreement between the railroad company and the (plaintiffs) must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations, is inconceivable. The framers of the Constitution never intended any such state of things to exist.
 ". . . After the commerce act came into effect, no contract that was inconsistent with the regulations established by the act of Congress could be enforced in any court. The rule upon this subject is thoroughly established."
 
 
 [3]
 Appellants rely heavily on Macco Construction Company v. Farr, 137 F.2d 52 (9th Cir. 1943), and Ets-Hokin & Galvan, Inc. v. Maas Transport, Inc., 380 F.2d 258 (8th Cir. 1967), Cert. denied, 389 U.S. 977, 88 S.Ct. 481, 19 L.Ed.2d 471 (1967). We think both decisions are inapposite. In Macco, we held that a contract which incidentally violated a California licensing statute was not thereby rendered unenforceable because the California legislature did not intend that such violations void otherwise legal contracts. 137 F.2d at 55. And in Ets-Hokin, which relied in part on Macco, the Eighth Circuit held that a contract which violated the Motor Carrier provisions of the Interstate Commerce Act was not unenforceable because Congress, in passing those provisions, did not intend "that contracts resulting in violations of that portion of the Act be illegal and void." 380 F.2d at 260-261. Here, however, as noted in the cited cases, Congress did intend to render void rates inconsistent with those established in conformity with the Act
 
 
 [4]
 Appellants cite Chicago, Milwaukee, St. Paul & Pacific Railroad Company v. Alouette Peat Products, 253 F.2d 449 (9th Cir. 1957), for the proposition that, even though shippers are required to pay carriers the rate on file with the ICC, a showing that such a rate was not lawfully established would entitle them to recover the difference between what they had thus paid and the lawfully established rate. Here, however, appellants have presented no showing that the published rate was unreasonable or otherwise established in violation of the Act. The mere fact that the published rate is inconsistent with a rate enumerated in pre-existing contracts does not render it violative of the Act
 
 
 [5]
 Southern Pacific Company v. Miller Abattoir Company, 454 F.2d 357 (3d Cir. 1972), relied on by appellants, is not to the contrary. That decision merely held that a provision in a shipping contract, requiring that the railroad immediately notify the consignee if a cargo of livestock were stopped in transit by quarantine, was not satisfied by the railroad's publication of a tariff explicitly stating that screw worms existed in Arizona and that livestock leaving that state would be stopped for inspection. See 454 F.2d at 361-362