**AMERICAN BROADCASTING COMPANIES, INC. and CBS Inc., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Midwestern Relay Company, Intervenor.**

**No. 78–1968.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 28, 1980.

Decided April 28, 1980.

---

Joseph M. Kittner, Washington, D. C., with whom Edward P. Taptich, Norman P. Leventhal and Joseph DeFranco, Washington, D. C., were on brief, for petitioners.

C. Grey Pash, Jr., Washington, D. C., counsel, Federal Communications Commission with whom David J. Saylor, Deputy Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, Washington, D. C., were on brief, for respondents.

Jay E. Ricks, Washington, D. C., with whom William S. Reyner, Jr., and Steven A. Levy, Washington, D. C., were on brief, for intervenor.

Robert B. Nicholson and Michael Pugh, Attys., Dept. of Justice, Washington, D. C., entered appearances, for respondent, United States of America.

Before WRIGHT, Chief Judge, and McGOWAN and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

█ When, despite a contractual agreement not to do so, intervenor Midwestern Relay Co. filed a revised tariff increasing its rates, two of its customers—petitioners ABC and CBS—urged the Federal Communications Commission to reject that tariff. The Commission declined, saying that, "in determining whether Midwestern's tariff revision is unlawful on its face we can give no weight to the mere fact that this revised tariff may conflict with a contract between Midwestern and Petitioners." 69 F.C.C.2d 409, 413 (1978). Petitioners now seek review of the Commission's decision. However, since we conclude that the Communications Act of 1934 does not permit communications common carriers to alter by contract the rates they announce in their filed tariffs, we hold that the Commission did not err.

## I

Television and radio networks assemble programs and distribute them to their affiliates through communications common carriers. Historically, the American Telephone and Telegraph Company has had much of this business. However, on October 20, 1972, CBS Inc., and on December 22, 1972, American Broadcasting Companies, Inc. (ABC) contracted with Midwestern Relay Company (Midwestern) for "point-to-point microwave network color video transmission service" for an area north of Chicago, Illinois. Both the CBS and the ABC contracts were for an initial service term of five years, both contracts specified terms and charges, and both contracts provided that Midwestern

shall not of its own volition during the term of this Agreement file any tariff which is inconsistent with the terms of this Agreement. A copy of FCC Tariff No. 1, when filed by [Midwestern] with the Federal Communications Commission, shall be attached hereto and made a part hereof.

J.A. 39, 48. Both contracts further provided that if ABC or CBS terminated the contract for a reason other than Midwestern's material breach of it, the network would pay Midwestern those non-recoverable capital costs attributable to the contract, as well as a proportion of the unpaid monthly charges for the initial service term. J.A. 39–40, 48–49.

On November 2, 1972, as 47 U.S.C. § 203 requires, Midwestern filed a tariff describing its charges with the Federal Communications Commission. That tariff contained the following provision:

5. *Period of Contract*

a. The initial contract period for service is five years.

b. A customer may terminate during the initial contract period subject to the payment of termination charges as provided below. After the initial contract period service may be terminated upon six months notice without payment of termination charges.

J.A. 23. However, the tariff nowhere reproduced the contract provision which forbade Midwestern to file a tariff inconsistent with the terms of the contract.

Several years after the contract had gone into effect, but before the expiration of the five-year contract period for service, Midwestern came to feel that "extraordinary unforeseeable circumstances" required it to increase the rates that had been specified in the contracts and filed in the tariff. Midwestern stated that it had lost $2,781,000 since beginning its operations and that it anticipated losing $1,208,000 more if it did not adjust its rates. On March 15, 1976, it filed with the Commission a revised tariff incorporating higher charges.

ABC and CBS petitioned the Commission to reject the revised tariff as unlawful on its face, a request the Commission denied on May 11, 1976. 59 F.C.C.2d 477. In doing so, the Commission quoted from its decision in *United Video, Inc.*, 49 F.C.C.2d 878, 880 (1974): "[T]he effective rates, practices, and regulations are those which appear in the carrier's tariff on file with the Commission and such tariff, the Commission's Rules, and the Act itself, are applicable as a matter of law, notwithstanding any conflicting provision appearing in the agreement executed by the carrier with its customers." However, in response to the request of certain of Midwestern's customers, the Commission suspended the revised tariff schedules until May 15, 1976, instituted an investigation into those schedules, and ordered Midwestern to keep a record of all amounts received due to the increase in rates.[1]

ABC and CBS petitioned for reconsideration, but on July 27, 1978, the Commission denied their petition. 69 F.C.C.2d 290. The Commission noted that, while the Commission may reject tariff revisions which are unlawful, "in determining whether Midwestern's tariff revision is unlawful on its face we can give no weight to the mere fact that this revised tariff may conflict with a contract between Midwestern and Petitioners." 69 F.C.C.2d 413. The Commission concluded:

> Even if we were to agree with Petitioners that carrier-customer contracts should be allowed to definitively establish rates in some limited areas, we are prevented from so finding as the Communications Act . . . does not provide for rates to be set in this manner.

69 F.C.C.2d at 418. On September 29, 1978, ABC and CBS sought review in this court of the Commission's decision.

## II

This case presents the question whether the Federal Communications Commission may reject as unlawful on its face the revised tariff of a communications common carrier because that tariff would increase the carrier's rates in violation of a contract between the carrier and two of its customers. Our answer to that question must, of course, be derived from the Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (1976), under the authority of which the Commission operates.

To understand the purposes of the Communications Act, however, we must look to

---

1. On March 21, 1979, pursuant to the Commission's order of May 11, 1976, that Midwestern's revised tariff rates be investigated, an Administrative Law Judge issued a Memorandum Opinion and Order. He reported, "The Trial Staff of the Commission's Common Carrier Bureau was the only participant in this case other than respondent itself. The networks elected not to pursue the administrative remedy afforded by this proceeding regarding the tariff provisions under investigation." As to the merits, the Administrative Law Judge excerpted and "fully endorse[d]" the conclusions of the Trial Staff:

> [G]iven the entire range of alternative resolutions of the specifically designated issues

[Midwestern] was or will be unable to achieve an "overall fair rate of return" (with the *limited* exception of 1978 under two assumptions). . . . On the basis of these results we find the rate revisions . . . under investigation in this proceeding to be reasonable, just and lawful, particularly in light of the following circumstances:

(1) The rate of return analyses utilize conservative calculations . . . and

(2) the present uncertainty and fluctuation facing [Midwestern] . . . .

*Midwestern Relay Co.*, F.C.C. V79M–385 at 3–4 (Mar. 22, 1979) (emphasis original).

the legislative history of the Interstate Commerce Act of 1887, for the Communications Act borrowed its language and purpose from the Interstate Commerce Act. As both the House and Senate Committees responsible for the Communications Act wrote:

In this bill many provisions are copied verbatim from the Interstate Commerce Act because they apply directly to communication companies doing a common carrier business, but in some paragraphs the language is simplified and clarified. The variances or departures from the text of the Interstate Commerce Act are made for the purpose of clarification in their application to communications, rather than as a manifestation of congressional intent to attain a different objective.[2]

The Interstate Commerce Act was Congress's response to widespread and vociferous dissatisfaction with the operation of the country's railroads. Prominent among the complaints against the railroads was

[t]hat the effect of prevailing policy of railroad management is, by an elaborate system of secret special rates, rebates, drawbacks, and concessions, to foster monopoly, to enrich favored shippers, and to prevent free competition in many lines of trade in which the item of transportation is an important factor.

.   .   .   .   .

It is substantially agreed by all parties in interest that the great desideratum is to secure equality, so far as practicable, in the facilities for transportation afforded and the rates charged by the instrumentalities of commerce. The burden of complaint is against unfair differences in these particulars as between different places, persons, commodities, and its essence is that these differences are unjust in comparison with the rates allowed or facilities afforded to other persons and places for a like service under similar circumstances.

S.Rep.No. 46, 49th Cong., 1st Sess. 181–82 (1886). *See American Trucking Associations v. Atchison, Topeka & Santa Fe Railway*, 387 U.S. 397, 406, 87 S.Ct. 1608, 1613, 18 L.Ed.2d 847 (1967). As the Supreme Court explained in *New York, New Haven & Hartford Railroad v. ICC*, 200 U.S. 361, 391, 26 S.Ct. 272, 277, 50 L.Ed. 515 (1906),

It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination.

In the Communications Act, this purpose was effectuated in the following manner. Drawing on common-law doctrines respecting common carriers, section 201 of the Act states that every communications common carrier must provide service at just and reasonable rates upon any reasonable request. Section 201 is reinforced by the specific prohibitions of section 202(a):

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

---

**2.** S.Rep.No. 781, 73d Cong., 2d Sess. 2 (1934).

The Communications Act was thought necessary primarily because responsibility for regulating the communications industry was shared by several agencies. The Interstate Commerce Commission had had jurisdiction over communications common carriers since 1910, and the subchapters of the Communications Act relating to common carriers "[f]or the most part .  .  . follow[ ] provisions of the Interstate Commerce Act now applicable to communications or adapt[ ] some provisions of that act now applicable only to transportation." *Id.* at 3.

In furtherance of section 202(a)'s prohibitions, section 203(a) requires every carrier subject to the Act to file with the Commission and make available for public inspection "schedules showing all charges for itself and its connecting carriers . . . and showing the classifications, practices, and regulations affecting such charges." Further, section 203(c) provides:

> No carrier, unless otherwise provided by or under authority of this Act, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this Act and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation, for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities, in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

A carrier may revise its rates simply by giving the public and the FCC thirty days' notice. No action by the Commission is needed to allow the new rates to go into effect. *American Telephone & Telegraph Co. v. FCC*, 487 F.2d 865, 871 (1973). However, when a tariff is filed the Commission may, *sua sponte* or upon complaint, conduct a hearing into the lawfulness of the tariff. 47 U.S.C. § 204 (1976). If the Commission finds that the tariff violates the Act, the Commission may prescribe a just and reasonable substitute. *Id.* § 205(a).

### III

With the structure and purpose of the Communications Act firmly in mind, we may proceed to examine the Supreme Court decision which controls this case—*Armour*

*Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908). *Armour* is controlling because in it the Court, in the analogous context of the Interstate Commerce Act, *see* note 2 and accompanying text *supra*, decided substantially the same issue we must decide here.

Defendants in *Armour* were charged with violating the Elkins Act, a statute which made criminal various failures to obey the terms of the Interstate Commerce Act. Defendants had contracted with the Burlington Company for service at the rate of 23 cents per 100 pounds, a rate which they continued to pay even after Burlington published and filed a tariff specifying a higher rate. Defendants argued that the contract "was at the legal, published and filed rate," and they "strongly urged that there is nothing in the acts of Congress regulating interstate commerce which can render illegal the contract between the shipper and the railroad company . . ." 209 U.S. at 80, 28 S.Ct. at 435. Because the Court's response to this argument is determinative of the issues presently before us, we quote from that response at some length:

> [T]his contention loses sight of the central and controlling purpose of the law, which is to require all shippers to be treated alike, and but one rate to be charged for similar carriage of freight and that the filed and published rate, equally known by and available to every shipper.
>
> . . . One rate is to be charged and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. *There is no provision for the filing of contracts with shippers and no method of making them public defined in the statute.* If the rates are subject to secret alteration by special agreement then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart.

209 U.S. at 80–81, 28 S.Ct. at 435 (emphasis added).[3]

In other words, the Interstate Commerce Act seeks to achieve its central purpose of preventing unjust discrimination by requiring that all carriers file with the Commission the terms and conditions on which their services are available. The Act, however, makes no provision for the filing of contracts between carriers and shippers. Since such contracts cannot be filed, it must follow that they are not a permissible means of establishing terms and conditions which override properly filed terms and conditions.

Similarly, the Communications Act states in section 203(c) that "[n]o carrier . . . shall engage or participate in such communication unless schedules [of its charges] have been filed and published . . . ." And similarly, while the Communications Act specifically contemplates some kinds of contracts, it does not provide for the filing of contracts of the kind at issue here. Section 201(b) of the Act provides

[t]hat nothing in this Act or in any other provision of law shall be construed to prevent a common carrier subject to this Act from entering into or operating under any contract *with any common carrier not subject to this Act*, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest.

(Emphasis added.) Section 211 complements section 201(b) and arguably [4] expands it to include all contracts between carriers:

(a) Every carrier subject to this Act shall file with the Commission copies of all contracts, agreements, or arrangements *with other carriers, or with common carriers not subject to the provisions of this Act*, in relation to any traffic affected by the provisions of this Act to which it may be a party.

(b) The Commission shall have authority to require the filing of any other contracts of any carrier, and shall also have authority to exempt any carrier from submitting copies of such minor contracts as the Commission may determine.

(Emphasis added.) However, section 211(a) does not require that the contracts between Midwestern and CBS and between Midwestern and ABC be filed, since while Midwestern is "a carrier subject to this Act," CBS and ABC are neither "other carriers" nor "common carriers not subject to the provisions of this Act." And while section 211(b) arguably may *authorize* the Commission to provide for the filing of contracts such as those here at issue, the Commission has not yet exercised such authority, if any, as it may have in this respect.[5]

The *Armour* Court held that, when the Burlington Company filed its initial tariff with the Interstate Commerce Commission, it thereby established the terms on which its services were available. Burlington's terms could not be altered by an unfiled contract with a customer in which Burlington agreed not to increase its charges for a specified period. Similarly, when Midwestern filed its initial tariff with the Federal Communications Commission, it thereby established the terms on which its services were available. Midwestern's terms could not be altered by an unfiled contract with a customer in which Midwestern agreed not

---

**3.** For a recent application of the *Armour* principle, see *Farley Terminal Co., Inc. v. Atchison, T. & S. F. Ry.*, 522 F.2d 1095, 1098 (9th Cir. 1975):

Where, as here, a conflict exists between published tariff rates and rates enumerated in pre-existing agreements, we think it well established that the tariff rates must prevail. Were we to permit enforcement of the inconsistent contractual rates, we would significantly undercut the clear policy of the Act to secure equal rates for all, as well as condone one discriminatory situation such as the Act was intended to remedy.

See also, e. g., *Aero Trucking v. Regal Tube Co.*, 594 F.2d 619 (7th Cir. 1979); *Illinois Central Gulf R. R. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588 (5th Cir. 1978).

**4.** See *Bell Tel. Co. of Pa. v. FCC*, 503 F.2d 1250, 1277 (1974), *cert. denied*, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).

**5.** Thus, we emphasize that we need not and do not determine the nature or extent of the Commission's power under § 211(b).

to increase its charges for a specified period.

## IV

Petitioners seek comfort from the fact that in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), the Court held that

> under the Natural Gas Act, 52 Stat. 821, 15 U.S.C. § 717 *et seq.*, a regulated natural gas company furnishing gas to a distributing company under a long-term contract may [not], without the consent of the distributing company, change the rate specified in the contract simply by filing a new rate schedule with the Federal Power Commission.[6]

350 U.S. at 333–34, 76 S.Ct. at 375. *Mobile*, however, is crucially different from *Armour*, for unlike the Interstate Commerce Act, the Natural Gas Act compels the filing of "all contracts which in any manner affect or relate to . . . rates, charges, classifications, and services." 15 U.S.C. § 717c(c) (1976). Thus the relevance of *Mobile* to the case before us lies in the Court's reiteration of its belief that the Interstate Commerce Act's failure to direct the filing of contracts reflected Congress's understanding that rates set by contract are overridden by a conflicting tariff. Having in mind its holding in *Armour*, the Court in *Mobile* carefully and explicitly said,

> [B]y requiring contracts to be filed with the [Federal Power] Commission, the [Natural Gas] Act expressly recognizes that rates to particular customers may be set by individual contracts. In this respect, the Act is in marked contrast to the Interstate Commerce Act, which in effect precludes private rate agreements by its requirement that the rates to all shippers be uniform, a requirement which made unnecessary any provision for filing

contracts. See *Armour Packing Co. v. United States.*

350 U.S. at 338, 76 S.Ct. at 378. Later in its *Mobile* opinion, the Court returned to the *Armour* precedent and again spoke in emphatic language directly applicable to the case presently before us:

> The very basis for [*Armour*], however, was the requirement of the Interstate Commerce Act that rates to all shippers be uniform and comply with the single tariff filed with the Commission, *there being no provision under that Act for the filing of individual contracts.* That is, the Interstate Commerce Act by its own force precluded contracts for rates different from those applicable to other shippers. The Natural Gas Act, on the other hand, recognizes the need for private contracts of varying terms *and expressly provides for the filing of such contracts as a part of the rate schedules.*

350 U.S. at 345, 76 S.Ct. at 381 (emphasis added).

Further, as the *Mobile* Court noted, the Natural Gas Act's requirement that all relevant contracts be filed provides the means whereby the public interest is secured: Because of that requirement, the Federal Power Commission can review those contracts and, where necessary, can cause them to be modified. 350 U.S. at 339, 76 S.Ct. at 378. In contracts, of course, since the Communications Act does not require that contracts such as the one at issue here be filed, review of contracts in the public interest would be difficult and even impossible.[7]

Petitioners also draw our attention to *Bell Telephone Co. of Pennsylvania v. FCC*, 503 F.2d 1250 (3rd Cir. 1974), *cert. denied*, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), which, petitioners allege, "affirmed a Commission ruling that the Communications Act does not allow a carrier to evade contractual obligations by the unilateral act of filing a tariff." However, even a curso-

---

6. In *FPC v. Sierra Pac. Power*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), the Court reached a similar conclusion as to the Federal Power Act, 16 U.S.C. § 824 *et seq.*

7. Petitioners also argue that "general regulatory law" supports their contentions. The difficulty with this argument, of course, is that the Communications Act, not general regulatory law, controls this case.

ry look at *Bell* reveals that its reasoning confirms ours.

The court in *Bell* accepted the proposition that "the holding in *Armour* that a tariff could supersede a contract was predicated upon the fact that the Interstate Commerce Act does not envision that shippers' rates will be set by contract." 503 F.2d at 1276. The *Bell* court was careful not to disturb this understanding of the holding in *Armour*, for it continued, "*While communications carriers may similarly be prohibited from contracting with customer-users*, we find no such directive barring contractual relations between independent carriers." *Id.* (emphasis added). The *Bell* court inferred the absence of such a directive from the fact that, as we noted above, section 211(a) of the Communications Act specifically provides that contracts between common carriers shall be filed with the Commission. Thus the court in *Bell* wrote,

> We conclude that section 211(a) requires the filing of contracts such as the AT&T —Western Union contracts at issue. It follows from this conclusion that the Act permits AT&T and Western Union to provide for the leasing of facilities by contract, as well as by tariff. *See United Gas Co. v. Mobile Gas Corp.*, 350 U.S. at 338, 76 S.Ct. at 378 ("by requiring contracts to be filed with the Commission, the [Natural Gas] Act expressly recognizes that rates to particular customers may be set by individual contracts."). *Armour* is therefore distinguishable.

503 F.2d at 1278.

## V

Petitioners seek to escape the logic of these cases by arguing that, since at the time it was entered into "the contract was pursuant to, and completely consistent with, Midwestern's effective tariff," the disputed contract provision was in effect incorporated in the tariff. Petitioners thus would apparently have us decide the question whether a tariff can bind a communications common carrier not to file a revised tariff. However, we do not agree that this case presents that question, and we expressly decline to address it.[8]

We begin by recalling that

> [o]ne rate is to be charged and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. . . . If the rates are subject to secret alteration by special agreement then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart.

*Armour*, 209 U.S. at 81, 28 S.Ct. at 435. *See* 47 U.S.C. § 203(c). The disputed contract clause states: Midwestern "shall not of its own volition during the term of this Agreement file any tariff which is inconsistent with the terms of this Agreement." The relevant tariff provision states: "The initial contract period for service is five years." We do not believe that the tariff provision put its readers on notice that Midwestern had undertaken the obligation expressed in the contract provision, since contracts need not, and often do not, provide that the rate to be charged will remain fixed for the duration of the contract. Our belief is strengthened by the fact that readers of the tariff could be expected to interpret it in light of the Supreme Court's pronouncement in *Armour* that "[i]f the shipper sees fit to make a contract covering a definite period for a rate in force at the

---

**8.** We pause only to observe that the Commission has in the past refused to approve language in a settlement agreement which would have required a common carrier not to exercise its right to amend a tariff for a specified period of time. *International Record Carriers' Scope of Operations*, 55 F.C.C.2d 96 (1975), *reconsid. granted on other grounds*, 55 F.C.C.2d 782 (1975). The Commission said:

> Realization of our statutory and public interest obligations is to a large extent dependent on the public, common carriers as well as their customers, bringing to our attention via tariff filings, complaints or other appropriate means matters which may affect the public interest. Such provisions in settlement agreements restrict the Commission's ability to have brought before it facts which allow it to fulfill its statutory obligations and are therefore contrary to public policy.

*Id.* at 99.

time he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law." 209 U.S. at 82, 28 S.Ct. at 436.[9]

Petitioners' argument serves simply to illustrate the significance of the presence *vel non* of a statutory requirement that contracts be filed. The difficulty here is precisely that, because no such provision applied to this contract, the clause in dispute was made available neither to the public nor the Commission. Hence, the disputed clause is just the kind of unpublished contractual alteration of a tariff which the Act condemns.

Petitioners contend that the contract might not actually cause price discrimination. This possibility, however, cannot alter our decision. As the Court in *Armour* wrote,

It is said that if the carrier saw fit to change the published rate by contract the effect will be to make the rate available to all other shippers. But the law is not limited to giving equal rates by indirect and uncertain methods. It has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be while in force the only legal rate. Any other construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish.

209 U.S. at 81, 28 S.Ct. at 435.

### VI

Finally, as petitioners believe, a wise public policy might permit and even encourage the kind of contract at issue here, since the purpose of that contract was to increase the availability of suppliers of program transmission services and thereby to enhance competition. But such was also the belief

of the defendants in *Armour*, and the Supreme Court's reply in that case must be our reply here:

It may be that such contracts should be recognized, giving stability to rates for limited periods; that the contracts being filed and published, and the rate stipulated known and open to all, no injustice would be done. But, as we have said, such considerations address themselves to Congress, not to the courts. It is the province of the judiciary to enforce laws constitutionally enacted, not to make them to suit their own views of propriety or justice.

209 U.S. at 82, 28 S.Ct. at 435.

For the reasons stated above, we affirm the order of the Commission.

*It is so ordered.*

---

9. Petitioners suggest that "the fact that the Commission accepted, without comment or objection of any kind, the Midwestern tariff provision requiring the five-year contract . . ." should affect our decision in this case. However, in light of our reasoning in the paragraph

to which this note is appended, and in light of the fact that the statutory plan permits tariffs to go into effect without the special approval of the Commission, we are not persuaded by petitioners' suggestion.