**ILLINOIS CENTRAL GULF RAILROAD COMPANY, Plaintiff,**

v.

**GOLDEN TRIANGLE WHOLESALE GAS COMPANY, Defendant.**

**No. EC 73–102–K.**

United States District Court,
N. D. Mississippi, E. D.

Nov. 10, 1976.

Joseph P. Wise, Jackson, Miss., for plaintiff.

Gary L. Geeslin, Columbus, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this action, plaintiff, Illinois Central Gulf Railroad Company (ICG), seeks to recover from defendant, Golden Triangle Wholesale Gas Company (Golden Triangle), charges allegedly due plaintiff under Freight Tariff 4–I (I.C.C. H–36) (hereinafter Maurer Tariff) for storage of hazardous material and charges allegedly due under Freight Tariff 19527–K (I.C.C. A–12154) (hereinafter Pace Tariff) for stopping materials in transit. Cross-motions of the plaintiff and defendant for summary judgment are now before the court.

The undisputed facts material to this action are as follows: ICG is a railroad corporation incorporated under the laws of Dela-

ware with its corporate domicile and principal office at Chicago, Illinois, and is duly authorized to engage in the transportation of freight and passengers for hire in interstate travel. The Columbus and Greenville Railway Company (C & G) was merged into ICG on September 29, 1972. Under the merger agreement, ICG became the surviving corporation of C & G and succeeded to the powers and rights of C & G and became liable for all its debts and liabilities. Golden Triangle is a Mississippi corporation with its corporate domicile and principal office at North Columbus, Mississippi. Golden Triangle is the corporate successor of Columbus Butane Gas Company (Columbus Butane). Defendant operates a low pressure gas plant at North Columbus where it receives railroad tank car shipments of liquified petroleum gas (LP gas). Defendant owns a private railroad track at its plant, but this track can accommodate only three tank cars at a time.

At the times pertinent to this action, the destination for all tank cars bound for defendant's plant was North Columbus. North Columbus is a local railroad station located north of plaintiff's Columbus yard. Because defendant's private track at North Columbus was inadequate to store the number of cars that might be received at any given time, on September 1, 1969, C & G and Columbus Butane entered into a lease agreement whereby Columbus Butane, for $36 per month, leased 600 feet of track in C & G's Columbus yard for the purpose of storing tank cars loaded with gas until such time as the North Columbus plant was ready to receive them. The track leased was track No. 6; it has three switches, one at each end and one that leads off the middle into the main line. On September 22, 1971, Columbus Butane, with the consent of C & G, assigned its rights and obligations under the lease to Golden Triangle.

The Maurer Tariff has been in effect since June 1, 1968; the Pace Tariff became effective November 19, 1971.

The question of law dispositive of this action is whether the Maurer and Pace Tariffs were applicable to the tank car shipments to defendant at its North Columbus station which were held for storage on defendant's leased track in plaintiff's Columbus yard. The parties have stipulated that if the tariffs were applicable, the amount due under the Maurer Tariff from June 12, 1970 to April 12, 1973, the period for which payment is sought by the original complaint, is $27,402.63, and the amount due under the Maurer Tariff from December 26, 1972 to March 11, 1973, also the period for which payment is sought by the original complaint, is $5,041.71. After the parties stipulated to these figures, plaintiff was granted leave to amend its complaint to include claims arising under the tariffs subsequent to the filing of the original complaint, resulting in a total claim of $28,257.89 under the Maurer Tariff, and a total claim of $5,419.11 under the Pace Tariff. In support of its motion for summary judgment, plaintiff has submitted the affidavit of Roy Garner, ICG's freight agent in Columbus, that the additional amounts claims are properly calculated. Defendant has not challenged the correctness of the amended totals.

It is undisputed that all shipments which are the subject of the dispute involve interstate shipments of LP gas and that all tank cars involved were leased to the consignee, Golden Triangle or Columbus Butane, and were stored upon track leased by the consignee from C & G. Also, it is undisputed that there was complete compliance with all provisions of the tariffs requiring designations on the cars indicating that they were leased private cars.

Rule 6 of § 2 of the Maurer Tariff provides:

> Storage will be charged  .  .  . on Explosives and other dangerous articles, held in or on railroad premises in excess of free time allowed, or without free time allowance when none is provided:
>
> Note 1—The term "Railroad Premises" as used in this rule, when applicable to shipments held in cars, shall embrace all tracks which this railroad provides for its own uses and purposes or for

general public use; also all other tracks located inside of its right-of-way, yard and terminals, except tracks located on, or within the confines of, property owned or leased by an industry.

ICG contends that the track leased by defendant is included within the first leg of the above definition of "Railroad Premises" —tracks which this railroad provides for its own uses and purposes . . . ." The question thus presented is whether the subject track is brought within the above definition by the railroad's reservation in the lease agreement of the right to

use said track in connection with any extensions of or tracks leading from or connected with the same now or hereafter constructed, for the purpose of reaching business and industries of others than LESSEE, and RAILWAY COMPANY may handle and transport the business of RAILWAY COMPANY and others either upon or along said track, as well as any extensions thereof or tracks leading therefrom or connected therewith.

In other words, is the above tariff definition of "Railroad Premises" limited to tracks which the railroad provides *solely* for its own uses, or does the definition embrace tracks which the railroad provides for its own uses *and* the use of a private party? By letter of R. D. Pfahler, Director of the Bureau of Operations of the ICC, to J. C. Humbert, ICG's Vice President-Operations, the ICC takes the position that the subject tracks are "Railroad Premises" since the lessees did not have exclusive use of the tracks. The ICG's position is based on the rulings in *Malloy and Dickerson v. M–K–T RR Co.*, 140 ICC 576 (1928), and *Skelly Oil Co. v. M–K–T RR Co.*, 123 ICC 517 (1927). Both cases involved the question of whether hazardous material storage charges applied to private cars on private siding tracks located on manufacturing plant property. Two definitions of "Railroad Premises" were considered, an original definition and its amended counterpart. The original provided:

The term "Railroad Premises" as used in this rule when applicable to carload

shipments, shall embrace all tracks which this railroad provides for its own uses and purposes; and also private tracks constructed, maintained or operated under a written agreement by which this railroad reserves the right to use the whole or any part of them for itself or others than the party with whom the agreement is executed.

The amended definition provided:

The term "Railroad Premises" as used in this rule, when applicable to shipments held in cars, shall embrace all tracks which this railroad provides for its own uses and purposes or provides for general public use; but shall not embrace tracks that are owned or leased by an industry and located upon property owned or leased by it unless such track is located inside of carrier's right-of-way, yard and terminals.

The cases hold that under the amended definition, the tracks under consideration— private sidings located on industry property—clearly were excepted from the definition; under the original definition, the terms of the contract regarding private tracks usually would control, but in no case could private tracks be considered Railroad Premises where, due to restrictive conditions of the contract reservation of the railroad's right to use of the tracks, or due to their location and construction, they could not be used by the railroad in the operation of its business as a common carrier.

■ Although the *Malloy* and *Skelly* cases involved different tariff definitions of railroad premises, they do establish as a general proposition that private tracks in certain circumstances properly may be considered railroad premises for purposes of applying tariffs on storage of hazardous materials. The purpose of such tariffs is to promote safety by encouraging prompt shipment and unloading of dangerous materials whose storage in railroad cars produces a risk of serious accidents. *See Western Petroleum Refiners Ass'n. v. Aberdeen & Rockfish RR Co.*, 66 ICC 58 (1922). The purpose of the Maurer Tariff clearly would

be stultified if imposition of fees under the tariff could be avoided by a consignee of hazardous materials through the leasing, for a nominal amount, of storage tracks located in a railroad yard in an urban area. Furthermore, the retention by the railroad of the right to use the leased tracks for switching purposes is, in the court's opinion, obviously the provision by the railroad of tracks for its own uses and purposes in the operation of its business as a carrier, as there are no restrictions whatsoever in the lease agreement limiting the railroad's right to use the tracks. We conclude the leased tracks in question are "Railroad Premises" for purposes of application of the Maurer Tariff.

██ The Pace Tariff, "TRANSIT TARIFF COVERING TRACK STORAGE," establishes "RULES AND CHARGES GOVERNING STOPPING IN TRANSIT FOR TRACK STORAGE OF . . . LIQUIFIED PETROLEUM GAS . . ." Under the "Rules and Other Governing Provisions" section of the tariff, Item 125, covering "Rates Applicable," provides that tariff charges are to be billed in addition to the through rate to the stop-off point, plus the balance of the through rate to final destination "when cars are reforwarded to a new destination." We believe that juxtaposition of the provisions of the Pace Tariff with those of the Maurer Tariff dictates the conclusion that only the Maurer Tariff is applicable on the facts of this case. Section 1, Rule 1, Section B, Paragraph 4 of the Maurer Tariff exempts from demurrage charges "[p]rivate cars on private tracks when the ownership of the car and track is the same (See Notes 1 and 2)." This rule includes leased cars and leased track within the terms "private cars and private tracks." Clearly then, the Golden Triangle shipments are not subject to Maurer Tariff demurrage charges. Note 1 referred to above, however, provides that "[p]rivate cars while held under constructive placement for delivery upon the tracks of their owners are subject to demurrage charges after expiration of forty-eight (48) hours free time. (See Rule 5, page 62 . . ..)" Section A, Paragraph 1 of Rule 5 states that:

When delivery of a car consigned or ordered to . . . other-than-a-public-delivery track cannot be made on account of the inability of the consignee to receive it . . . such car will be held at destination, or, if it cannot reasonably be accommodated there, at an available hold point, notice shall be sent or given the consignee in writing or, in lieu thereof, as otherwise agreed to in writing, that the car is held and that this railroad is unable to make delivery. *This will be considered constructive placement.* (Emphasis added)

It appears to the court that the shipments in question here would "be considered [under] constructive placement" while held in the Columbus yard. It further appears as a matter of logic that railroad shipments cannot be considered stopped in transit if they have been placed for unloading, even though such placement is constructive. In other words, the court is of the opinion that the Pace Tariff applies when a consignor or consignee, by choice, orders a railroad to stop-off a shipment in transit at some station other than the originally-designated destination point. Where a shipment is constructively placed—held by the railroad due to a consignee's inability to accept shipment—only the Maurer Tariff is applicable, and in the absence of a private car-private track situation where constructively placed cars are held by a railroad, the constructively placed cars would be subject to Maurer Tariff demurrage charges.

The Maurer Tariff demurrage rules recognize that cars stopped in transit and cars constructively placed are in two distinct situations. Under Rule 3 of Section 1, dealing with computation of time under the demurrage rules, Section D provides "on cars to be delivered on other-than-public-delivery tracks, time will be computed from the first 7:00 A.M. after actual or constructive placement on such tracks." Section G of the same rule provides

"[o]n cars subject to Rule 2, Section B, Paragraph 4, page 57 [cars held in transit because of any condition solely attributa-

ble to consignor, consignee or owner, not otherwise specifically provided for in these rules], time will be computed from the first 7:00 A.M. after notice that the car has been stopped in transit and is being held, has been sent or given the consignor, consignee or party entitled to receive same."

The notice of arrival of shipments provisions of Demurrage Rule 4 also provides differing requirements in the two situations. Section B of that rule states that "[w]hen cars are *ordered* stopped in transit, notice shall be sent or given the party *ordering the cars stopped* upon arrival of cars at point of stoppage." (Emphasis added). Section C of the same rule provides "[d]elivery of cars upon other than public delivery tracks . . . or notice sent or given to consignee or party entitled to receive same, of readiness to so deliver, will constitute notification to consignee. (See Rule 5, Section A, Paragraph 1 [defining constructive placement] . . .)."

█ Golden Triangle's argument that the hazardous material storage charges imposed under Section 2, Rule 6 of the Maurer Tariff are no more than demurrage charges, from which Golden Triangle is exempted under Section 1, Rule 1 of the Maurer Tariff does not withstand analysis. Section 1 of the Maurer Tariff covers "GENERAL CAR DEMURRAGE RULES AND CHARGES;" Section 2 covers "STORAGE RULES AND CHARGES." Note 2 to Section 2, Rule 6 expressly provides "[t]he charges provided in this rule on shipments held in cars are in addition to the regular demurrage and track storage charges . . . ." Furthermore, Section 2, Rule 6, Section B, entitled "FREIGHT SUBJECT TO THE RULES; ALSO EXEMPTIONS THEREFROM," provides: "Carload shipments of explosives or other dangerous articles are subject to both demurrage rules and Storage Rule 6 while held in cars . . . ." Exemption from demurrage rules of the Maurer Tariff clearly is not exemption from the storage rules.

█ Golden Triangle's argument that ICG should be estopped from collecting charges due under the Maurer Tariff is also without merit. Filed tariffs have the force of law, *Southern Pacific Co. v. Brown, Alcantor & Maun, Inc.*, 409 F.2d 1331, n. 1 (5 Cir. 1969), and they cannot be avoided by private contract, *Illinois Steel Co. v. Baltimore & Ohio RR Co.*, 320 U.S. 508, 511, 64 S.Ct. 322, 324, 88 L.Ed. 259, 264, n. 3 (1943). Equitable considerations cannot justify a carrier's failure to collect authorized tariff charges, *Chicago & North Western RR v. Union Packing Co.*, 514 F.2d 30, n. 1 (8 Cir. 1975); thus the principle of estoppel cannot be invoked against the right of a carrier to enforce legally applicable tariffs, *Pittsburgh, C.C. & S.L. Ry. Co. v. Fink*, 250 U.S. 577, 582, 40 S.Ct. 27, 63 L.Ed. 1151, 1153, n. 3 (1919).

It has long been the law that where carriers charge a rate for shipment less than the tariffs as approved by the Interstate Commerce Commission they may be penalized therefor, and where a less rate has been charged and collected it becomes the duty of the carrier to call upon the shipper to pay the promulgated and approved tariff rate. *Tex–O–Kan Flour Mills Co. v. Texas & P. Ry. Co.*, 178 F.2d 89, 90 (5 Cir. 1949).

ICG, then, not only has the right to collect the hazardous material storage charges under the Maurer Tariff, it has an affirmative duty to do so, and this duty cannot be modified by the principle of estoppel.

For the foregoing reasons, ICG is entitled to summary judgment on its claim under the Maurer Tariff in the amount of $28,257.89, plus prejudgment interest from the due date of the freight charges, *Louisiana & Ark. R. Co. v. Export Drum Co.*, 359 F.2d 311 (5 Cir. 1966). Prejudgment interest is to be computed at a rate of 6%, Miss.Code Ann. § 75–17–1 (Supp.1976). Interest on the total judgment, that is the freight charges due plus prejudgment interest, shall accrue at the statutory rate of 8% per annum from this date, § 75–17–7. Golden Triangle is entitled to summary judgment on the claim asserted under the Pace Tariff. Costs are taxed to defendant.

Let an order be entered accordingly.