**ARMOUR AND COMPANY, a corporation, Plaintiff-Appellee,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Defendants-Appellants.**

**No. 12195.**

United States Court of Appeals Seventh Circuit.

May 6, 1958.

Edward R. Gustafson, William C. Leiper, Noah Walker, Chicago, Ill., J. T. Clark, Kemper Dobbins, Cleveland, Ohio, for appellant.

John L. Bordes, Charles Marcus Whiting, Weymouth Kirkland, of Kirkland, Fleming, Green, Martin & Ellis, Chicago, Ill., for plaintiff-appellee, George E. Leonard, Jr., Chicago, Ill., of counsel.

Before DUFFY, Chief Judge, and HASTINGS and PARKINSON, Circuit Judges.

HASTINGS, Circuit Judge.

An order of the Interstate Commerce Commission directed appellants, a number of railroads, to make reparation to appellee, Armour and Company, of freight rate overcharges aggregating $225,907.62 found to have been charged and paid on numerous shipments of fresh meat from Kansas City, Kansas, South St. Joseph, Missouri and South Omaha, Nebraska to numerous destinations in the East from May 6, 1948 through September 5, 1949. Armour and Company brought this action under Section 16(2) of the Interstate Commerce Act, 49 U.S. C.A. § 16(2) to enforce the Commission's order. This appeal is by the railroads from a judgment of the district court entered on findings favorable to Armour and Company on the issues involved.

Rates on fresh meat from producing points in the West to various eastern destinations are made on the basis of aggregates of rates published to and from intermediate points along the Misissippi river which are known as Iowa border points and Mississippi river crossings. Through (one factor) rates are contained in the class rate tariffs published by the railroads but, in practice, are never paid because of the aggregate-of-intermediates rule set forth in appellants' tariff which provides:

"If the aggregate of separately established (joint, local or proportional) rates [1] applicable on interstate traffic contained in tariffs lawfully on file with the Interstate Commerce Commission applicable via any route over which the through rates published in this tariff apply, produces a lower charge on a shipment than the rates published herein, such aggregate of rates will apply via all routes over which the rates shown in this tariff are applicable, and the through rate published in this tariff has no application to that shipment."

There is always some aggregate of rates applicable from the origins to the destinations here involved lower than the through class rates and, consequently, the effective rate at all times is based on some aggregate of the intermediate rates. The lowest aggregate of intermediate rates becomes the published rate.

[1.] The various categories of rates are defined as follows: A *local* rate is one that extends over the lines of one carrier only. A *joint* rate is one that extends over lines of two or more carriers and is made by arrangement or agreement. A *proportional* rate is one dependent on a previous or subsequent transportation, that is, it applies *only* as a part of a combination or aggregate rate. Additionally, local and joint rates may be published as *flat* rates or *restricted* rates. A flat rate is a local or joint rate that is published from or to specified points and applies normally as to shipments originating from or destined to that point. It may be applied as a proportional rate in the absence of proportional rates published as such. A restricted rate is either a local or joint rate published from and to specified points with limited application so that it will apply only on shipments originating at, or destined to, such points. A restricted rate thus has no application as a proportional rate.

During the reparation period there were thirteen west bank Mississippi river crossings, thirteen east bank crossings and thirty-three Iowa border points. Commodity rates on fresh meats in carloads were published from the origins involved in this case to all these points; similarly, commodity rates were published from all these points to the destinations involved. Rates *from* all these points were on the same level except during the reparation period when the flat rate from Hurst Mill Spur, one of the Iowa border points, was inadvertently made lower than the rates from the other border points and river crossing.[2] As a result, the aggregate through rate based on Hurst Mill Spur was lower than the aggregate rate through the other intermediate points. This situation continued to exist until, effective September 6, 1949, the rate from Hurst Mill Spur was made to coincide with that from the other points. Although appellee discovered or became aware of the lower aggregate based on Hurst Mill either late in 1948 or early in 1949, it continued to pay the higher rates without protest throughout the reparation period.

Appellants contend that the claimed aggregate rates through Hurst Mill Spur were not legally applicable during the reparation period for the reason that that station had, in effect, been abandoned with no facilities for handling freight; and that the district court erred in its finding that the station was "a valid existing station * * * during the reparation period * * *" and in its conclusion that "[t]he aggregate of rates published to and from Hurst Mill Spur were the applicable rates * * *."

Hurst Mill Spur is characterized by appellants as having had no physical existence whatsoever during the reparation period, existing only as words in a tariff. The station took its name from a siding constructed in 1919 from the main line of the Chicago, Milwaukee, St. Paul & Pacific Railroad (Milwaukee Road) to a saw mill owned by Alfred Hurst. In 1927 part of the siding was removed and in 1933 the remainder of the siding and all other rail facilities were removed leaving only the railroad's main line tracks running along the west bank of the river. There are presently no facilities, rail or non-rail, existent at the location.

From the fact of non-existence of facilities appellant argues the abandonment of the station and its consequent unavailability for rate making purposes. The obligation of a railroad to charge no more than the published rates relates, it is contended, only to rates covering transportation between *existent* points or stations.[3] In this connection, however, it should be noted that the Hurst Mill Spur station, although claimed to have been actually abandoned by the Milwaukee Road in 1933, was not eliminated from the tariff of the railroad as required by Commission Rule 10(i) of Tariff Circular 20 as amended by Supplement No. 5.[4] The rule

2. This mistake was occasioned when, effective May 6, 1948, the Commission authorized an increase of 30% in the rates within the Eastern territory and of 25% between Zone 1 of the Western Trunkline and the Eastern territory. For the purposes of such increases Iowa border points and Mississippi river crossings were included in the Eastern territory. The railroads were thus authorized but not required to increase the rates from the intermediate points by thirty percent. All the crossings and border points except Hurst Mill Spur were named as points from which the 30% increase applied. There is no contention that the failure to increase Hurst Mill Spur rates to the full thirty percent limit was other than an oversight on the part of appellants.

3. See 49 U.S.C.A. §§ 6(1) and (7) which refer to rates, fares and charges for transportation between "points" on railroad routes.

4. The rule provides:
"A tariff publication may be filed containing a list of stations with the railroad location of each, alphabetically and geographicaly arranged with index numbers, prepay requirements, station facilities, billing instructions from or to points not located on railroads, additions of new stations, abandonment of stations, changes in names of stations and restrictions as to non-acceptance and non-deliv-

in question requires a notice of abandonment in the Official List of Open and Prepay Stations and an elimination of the station from the rate tariff in the next supplement to the tariff after the effective date of abandonment. Hurst Mill Spur station was not eliminated from the rate tariff or shown as abandoned in the Official List of Open and Prepay Stations until September 1, 1952. The only notation in regard to the station in the Official List was that no facilities existed at the station for handling local shipments.

Appellants insist that their failure to comply with the rule governing abandonment does not alter the fact that the station was actually abandoned and the rate from the station invalid. It is their position that the retention of the invalid rate in the tariff may constitute a violation of Rule 10(i) and subject them to penalties under 49 U.S.C.A. § 6(10). Further, that the holding out of the invalid rate could make them liable for any damages occasioned by shippers making shipments in reliance on such rates. It is urged, however, that the invalid rate does not and cannot become valid and applicable merely because of the failure to comply with the rule.

We do not reach this last question, however, since we find that there is a complete lack of authority for the proposition that the disappearance of a station's rail facilities renders invalid any rate which may be published from that station.

Appellee introduced convincing testimony to establish that the lack of loading and unloading facilities or other station facilities does not necessarily evidence an intention to abandon a station. The Assistant Manager of appellee's rate department testified that there are railroad stations to or from which no local freight or passengers ever moved or were intended to be moved. He indicated that stations are often used as interchange points where freight is changed from one railroad to another, no freight being accepted or delivered from these points. Others are used for basing point purposes. The rates from or to these basing points are used in constructing through rates between other points. These stations as listed in the Official List of Open and Prepay Stations are noted to indicate that there are no facilities for handling freight or that they are for basing point purposes only. The witness referred specifically to East Burlington, Illinois, a station on the Chicago, Burlington and Quincy Railroad and one of the river crossings which like Hurst Mill Spur has no facilities other than a through track. Like Hurst Mill Spur it is noted in the official list as not having facilities for handling freight. There is no note indicating that it is used for basing point purposes only. Although there are no rail facilities at East Burlington, it is a significant basing point over which rates on livestock are made from western origins to points east of the Illinois-Indiana state line. The witness indicated that these rates could not be made to and from nearby Burlington, Iowa because the rates to Burlington are published as higher flat rates rather than proportional rates.[5]

It seems clear that there is no requirement that a point must have facilities for handling freight before valid rates to and from such points can be established. As indicated in the Commission's report in this case (291 I.C.C. 223), the Official List of Open and Prepay Stations printed in the tariff contains various limitations as to station facilities. Twenty-one stations in Iowa alone are shown as having no facilities for handling freight. Many points are indicated to have only private

ery of freight. No rates or charges, nor any information which will in any way increase or decrease the rate or charge in the tariffs making reference to this publication can be shown therein. * *

"When a station has been abandoned as of a date specified in the publication authorized by this rule, the rates from or to such station have become inapplicable and the station must be eliminated in the next supplement to tariffs naming such station or in reissues of such tariffs. * * *." 291 I.C.C. 223, 230.

5. See note 1 supra.

facilities available to others only on arrangement with the owners. The notice given in the tariff that there were no facilities at Hurst Mill Spur for handling freight was clearly intended for the information of shippers who might be interested in the use of such facilities. Such notice could not be construed as a restriction against rates published in the tariff. The railroad seems to infer that because the rate published from Hurst Mill Spur was a flat rate [6] it could have applied only to shipments originating there. However, the rate was not so restricted in its application and could have been applied as a proportional rate in the absence of a proportional rate published as such. Swift & Co. v. Alton R. Co., 262 I.C.C. 783, 784.

The authorities cited by appellants do not support their position on the facts in this case. The case of Cancellation of Rates on Lumber to Texas, 167 I.C.C. 561, involved a carrier's proposed elimination of certain stations from tariffs naming rates on lumber and forest products. The carrier in that case had previously noted in the Official List of Open and Prepay Stations that the stations were abandoned. It contended that the cancellation of the rates was accomplished by such notation. The Commission would not pass on these contentions of the carrier but, instead, decided that the rates were inapplicable from the date of the abandonment of the service involved, that is, from the date the railroad discontinued delivery of lumber and forest products through the stations involved. As the Commission noted at page 565: "We have repeatedly held that tariffs should not be maintained to cover service which is not available." In the instant case, where the carrier was engaged in the service of transporting fresh meats, the station or point at Hurst Mill Spur was, like many other Iowa border points, used as a basing point for constructing rates on that service. The abandonment of the station rail facilities had no direct effect on the use of Hurst Mill Spur for that purpose, while the same cannot be said of the case of Cancellation of Rates on Lumber to Texas, supra, where the railroad had actually abandoned the service for which the rate was maintained.

Appellants also rely on Drayage & Unloading at Jefferson City, Mo., 206 I.C.C. 436. This case concerned an order to cancel rates published for a service not subject to the jurisdiction of the Commission. There is nothing in the case to lend support to the position that the existence of a railroad station is dependent on physical facilities. Similarly inapposite is Powell v. United States, 1937, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643.

We hold that the district court did not err in finding Hurst Mill Spur a valid, existing station and in concluding that the rate published therefrom was applicable. Appellants have established no basis for a holding contrary to the general rule that the published rate is the applicable rate.

Much of appellants' brief questions what is characterized as the basic injustice of the result sought to be achieved in this case by appellee. Appellants point out that appellee has, by stipulation, admitted that it was aware of the existence of the Hurst Mill Spur rate either late in 1948 or early in 1949 but continued to pay the "going" rate without protest. There was no reliance by appellee on any conduct of the railroads which resulted in damage to appellee. This recovery is, in effect, a windfall. Appellants concede, however, as they must, that the legality of the rate claimed applicable is not dependent upon the equities involved. The only lawful rate is the rate published in the tariff. New York Central & Hudson River Railroad Co. v. York & Whitney Co., 1921, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016; Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink, 1919, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151. A mistake in the publication of a rate in a tariff schedule is no justification for a departure from the published tariff. See Beaumont, Sour

---

6. See note 1 supra.

Lake & Western Ry. Co. v. Magnolia Provision Co., 5 Cir., 1928, 26 F.2d 72, in which a rate of twenty-three cents was published by mistake. The carriers intended to keep in force the preexisting rate of seventy cents but were held bound by the published rate. The court stated at page 73:

> "In Lamb-Fish Lumber Co. v. Y. & M. V. R. R. Co., 42 I.C.C. 470, the Interstate Commerce Commission announces the rule that proof of error in the publication of rates does not justify a departure from the published rates, even though shippers have full knowledge that the rates were published by mistake, and that decision was cited with approval by the Supreme Court in Davis v. Portland Seed Co., 264 U.S. 403, 424, 44 S.Ct. 380, 68 L.Ed. 762."

■ It has also clearly been established that in a straight overcharge case based on Section 6(7) of the Interstate Commerce Act, 49 U.S.C.A. § 6(7), no proof of damage other than payment of charges in excess of the published rate is necessary. Pennsylvania Railroad Co. v. International Coal Mining Co., 1913, 230 U.S. 184, 202, 33 S.Ct. 893, 57 L.Ed. 1446.

Four commissioners joined in a vigorous dissent from the report of the Commission ordering reparation in this case.[7] It was their position that the "strict interpretation" of the tariff adopted by the majority operated unjustly in requiring the reparation of a large sum in a case in which the shipper was not misled but indeed was fully aware of the existing situation. This court refuses to pass on the conduct of the parties involved. The railroads for reasons best known to themselves maintain a complicated rate scheme. An error resulted, but the error was not, as the railroads urge, in their having forgotten about an abandoned station, but rather in their failure to put in effect the intended rate at Hurst Mill Spur, a valid existing station. The lower rate from that station, under any interpretation of their tariff, was, during the reparation period, the published rate for the transportation of fresh meat from the western locations here involved through the intermediate points to eastern destinations.

The judgment below is

Affirmed.

---

7. This case has posed quite a problem for the Commission. The hearing examiner in his proposed report found for Armour and Company concluding that Hurst Mill Spur was a valid station for rate making purposes. The Commission at first rejected the examiner's report holding that since there were no facilities at Hurst Mill Spur the flat rates from the station were inapplicable on shipments originating at that point and, consequently, although a flat rate could apply as a proportional rate in constructing aggregate rates, it must be applied with all the limitations surrounding it. Thus, an invalid flat rate does not become valid for proportional rate purposes. Two commissioners dissented. (288 I.C.C. 243.) On reargument, the Commission completely reversed its position holding along the same lines as the examiner in his originally proposed report. (291 I.C.C. 223).