**ILLINOIS CENTRAL GULF RAILROAD COMPANY, Plaintiff-Appellee,**

v.

**GOLDEN TRIANGLE WHOLESALE GAS COMPANY, Defendant-Appellant.**

No. 77–1613.

United States Court of Appeals, Fifth Circuit.

Dec. 21, 1978.

Gary L. Geeslin, Columbus, Miss., for defendant-appellant.·

Joseph P. Wise, Jackson, Miss., for plaintiff-appellee.

Before COLEMAN, CLARK and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Golden Triangle, a shipper on Illinois Central's railroad lines, made a lease with the Railroad under which it had non-exclusive use of trackage within one of the Railroad's yards to store railroad cars containing a hazardous material for a nominal rental. The purpose of this agreement was to avoid the payment of the charges required by a tariff that would otherwise be applicable. The district court held that the tariff was applicable despite the effort to avoid its terms, and that the Railroad was not estopped, indeed was required, to collect the tariff-exacted charges. We affirm this manifestly correct result.

## I. FACTS

Golden Triangle (Gas Company) operates a low pressure gas plant at North Columbus, Mississippi, where it receives railroad tank car shipments of liquified petroleum (LP) gas. In 1969, Butane Corp., Golden Triangle's corporate predecessor, did not have enough railroad trackage in its own yard to hold the number of cars necessary for the proper operation of its business. It did not want to pay the usual railroad storage charges, and the Railroad wanted to keep its business. Therefore, in September, 1969, the Gas Company entered into a lease agreement with the Columbus and Greenville Railway, Illinois Central's predecessor.[1] In return for $36 per month, the Railroad leased to the Gas Company 600 feet of track in its own railroad yard, enabling the Gas Company to store tank cars loaded with LP gas on the Railroad's track until it was ready to receive them in the North Columbus yard. The "leased" track had three switches, one at each end and one that led from the middle into the main line. Although the lease gave the Gas Company the right to use the track for storage purposes, the Railroad reserved the right to use them for the purpose of handling other business. The record contains no evidence concerning whether or not the Railroad used the track

for any purpose other than storing the Gas Company's tank cars.

After the agreement had been in effect almost four years, the Director of the Bureau of Operations for the Interstate Commerce Commission wrote the Railroad's Vice President informing him that the Maurer Tariff (Freight Tariff 4–I, B.B. Maurer agent, ICC H–36) applied to the Gas Company's storage of the tank cars containing LP gas on the leased track, and directing the Railroad "to take such action as may be necessary to correct the situation." The Maurer Tariff requires the payment of storage charges for each railroad car containing a hazardous substance, and its application would result in substantial additional expense to the Gas Company. The Railroad subsequently issued corrected freight bills and demanded their payment. When the Gas Company refused to pay, this action was brought seeking approximately $28,000 for charges allegedly owed under the Maurer Tariff, and a lesser amount for charges allegedly owed under the Pace Tariff[2] (a tariff that governs stopping cars containing LP gas in transit for track storage).

Both parties stipulated that there were no genuine disputes concerning material issues of fact, and that, if the tariffs were found to be applicable, the amounts sought were proper. The district court agreed with the ICC that the Pace Tariff was not applicable, and no appeal has been taken from that determination. The district court did hold, however, that the Maurer Tariff was applicable, and the Gas Company appeals that determination.

## II. APPLICABILITY OF THE MAURER TARIFF

▮ The Maurer Tariff is applicable to hazardous materials held on "railroad premises;" shipments held in railroad cars are deemed to be on "railroad premises" if: (1)

---

1. Both corporate successors acquired the powers and rights of their predecessors and also became liable for all of their debts, obligations, and liabilities.

2. Freight Tariff 19527–K, ICC A–12154.

such cars are located on track that a railroad "provides for its own use and purposes or for general public use;" or (2) such cars are situated on any other track located inside a railroad's right-of-way, yard or terminals, "except tracks located on, or within the confines of, property owned or leased by an industry." Rule 6, § 2, Freight Tariff 4–I (ICC H–36). The district court held that the Gas Company's cars were located on railroad premises, as defined in the first branch of the above definition, because, by the terms of the lease agreement, the Railroad reserved the right to use the track on which the shipments were stored for its own purposes. The court correctly concluded that the track was held for the Railroad's own uses and purposes, and, therefore, constituted "railroad premises."

■ Even though there is no evidence that the leased track was actually used by the Railroad for its own purposes, the retention of the right to use it means that the track nevertheless was subject to the Railroad's control; it was not subject to the exclusive use of the Gas Company. The tariff is intended to promote public safety by encouraging the prompt shipment and unloading of dangerous materials whose storage in railroad cars produces a risk of serious accident. *Cf. Western Petroleum Refiners Association v. Aberdeen & Rockfish Railroad*, 1922, 66 ICC 58, 62 (predecessor tariff); *International Agricultural Corp. v. Atlanta & West Point Railroad*, 1914, 32 ICC 199, 200–01 (similar tariff). Its purpose could be easily avoided if its application were evaded by permitting private use of railroad tracks in conjunction with their contemporaneous public use. Three cases involving predecessor tariffs with different definitions of railroad premises recognized that private tracks in certain circumstances could be considered railroad premises for purposes of applying tariffs on storage of hazardous materials. *See Malloy and Dickenson v. Missouri-Kansas-Texas Railroad*, 1928, 140 ICC 576; *Skelly Oil Co. v. Missouri-Kansas-Texas Railroad*, 1927, 123 ICC 517.

■ Even if the first part of the definition of railroad premises provided in Rule 6 were not applicable in this case, the arrangement in question involved "railroad premises" under its second portion. That branch of the definition provides an exception for track located on *property* owned or leased by an industry, as opposed to *track* leased by an industry. This language, viewed in the light of the purpose of the Maurer Tariff, suggests an intention to except from the tariff private sidings located on industry property and private track situated on property not used by a railroad to serve the general public; in either situation serious danger to the public would not be likely in the event of an accident. *Cf. Malloy and Dickenson, supra; Skelly Oil Co., supra.* The exception does not appear to have been intended to cover property in a railroad yard primarily used for the purpose of serving the general public.

Moreover, we are not here concerned merely with the past operation of the tariff; to adopt the Gas Company's views would permit future avoidance of the safety purposes of the Maurer Tariff. As the district court noted, "[t]he purpose of the Maurer Tariff clearly would be stultified if imposition of fees under the tariff could be avoided by a consignee of hazardous materials through the leasing, for a nominal amount, of storage tracks located in a railroad yard in an urban area." *Illinois Central Gulf Railroad v. Golden Triangle Wholesale Gas Co.*, N.D.Miss.1976, 423 F.Supp. 679, 682–83.

## III. ESTOPPEL TO ASSERT THE MAURER TARIFF'S APPLICABILITY

The Gas Company contends, as it did in the district court, that the Railroad should be estopped from collecting the hazardous storage charges because the Railroad induced the Gas Company to enter the lease through assurances that the storage charges for hazardous substances would not be collected. In addition, the Gas Company

asserts that the parties contractually agreed that the tariff would not apply, and that the Railroad should not be allowed to assert the invalidity of their agreement. Both of these arguments are without merit.

■ The Interstate Commerce Act was designed to provide uniformity in charges for services, and, thereby, to prevent rate discrimination. *See, e. g., Midstate Horticultural Co. v. Pennsylvania Railroad Co.,* 1943, 320 U.S. 356, 361, 64 S.Ct. 128, 130, 88 L.Ed. 96, 101; *Pittsburgh, Cincinnati, Chicago, & St. Louis Railway v. Fink,* 1919, 250 U.S. 577, 581, 40 S.Ct. 27, 27, 63 L.Ed. 1151, 1153; *Boston & Maine Railroad v. Hooker,* 1914, 233 U.S. 97, 112, 34 S.Ct. 526, 528, 58 L.Ed. 868, 876. If a carrier could modify its tariffs without filing a new tariff, it could engage in rate discrimination. Similarly, to permit a party to invoke estoppel in cases in which a recipient of services covered by a tariff was promised a different charge for those services would undermine the policy of uniformity in charges that underlies the Interstate Commerce Act; it would be possible for rate discrimination to occur through the subterfuge of a carrier's deliberately misinforming a shipper as to the proper charges for services to be rendered.

■ Therefore, filed tariffs have the force of law, *Southern Pacific Co. v. Brown, Alcantar & Brown, Inc.,* 5 Cir. 1969, 409 F.2d 1331, 1332; *Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co.,* 5 Cir. 1962, 303 F.2d 692, 696, *cert. denied,* 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276, and establish the liability of a recipient of services covered by the tariff, even if the recipient was quoted a different price, *see Louisville & Nashville Railroad v. Maxwell,* 1915, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853, 855; *St. Louis Southwestern Railway Co. v. Garvey Elevators, Inc.,* 5 Cir. 1974, 505 F.2d 625, 626; *Atchison, Topeka and Santa Fe Railway v. Bouziden,* 10 Cir. 1962, 307 F.2d 230, 235, or was party to a contract under which the services were to be provided at a different price, *Texas &*

*Pacific Railway v. Mugg & Dryden,* 1906, 202 U.S. 242, 245, 26 S.Ct. 628, 50 L.Ed. 1011; *Cincinnati, New Orleans & Texas Pacific Railway v. Chesapeake & Ohio Railway,* 4 Cir. 1971, 441 F.2d 483. *See Illinois Steel Co. v. Baltimore & Ohio Railroad,* 1944, 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed. 259; *Louisville & Nashville Railroad, supra; Tex-O-Kan Flour Mills Co. v. Texas and Pacific Railway,* 5 Cir. 1949, 178 F.2d 89, *cert. denied,* 1950, 339 U.S. 930, 70 S.Ct. 665, 94 L.Ed. 1350. A carrier cannot waive or modify legally applicable tariffs, *see Illinois Steel Co., supra,* and *Tex-O-Kan Flour Mills Co., supra,* and individual hardship is not a defense to the application of such tariffs. *New York Central & Hudson River Railroad v. York & Whitney Co.,* 1921, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016; *Pittsburgh, Cincinnati, Chicago & St. Louis Railway v. Fink, supra.* Equitable considerations cannot justify a carrier's failure to collect authorized tariff charges, *Chicago & North Western Railroad v. Union Packing Co.,* 8 Cir. 1975, 514 F.2d 30, nor can they be invoked as the basis for an estoppel to collect such charges. *Fink, supra,* 250 U.S. at 582, 40 S.Ct. at 28, 63 L.Ed. at 1153. *See also Baldwin v. Scott County Milling Co.,* 1939, 307 U.S. 478, 59 S.Ct. 943, 83 L.Ed. 1409; *York & Whitney Co., supra.*

■ The Gas Company, as a shipper, "must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by tariff." *Fink, supra,* 250 U.S. at 581, 40 S.Ct. at 28, 63 L.Ed. at 1153. Filed tariffs are public information, 49 U.S.C. § 6(1), of which shippers should be aware. Shippers need not rely on the charges quoted by carriers; they may check the filed tariffs to ascertain the cost of services that they desire. Although reviewing filed tariffs may be burdensome to shippers, to permit a tariff to be avoided when the railroad knows of its applicability and the shipper does not would foster the evil of rate discrimination that the Interstate Commerce Act was designed to eliminate. In any case, the Gas

Company admits that it was aware of the existence of the Maurer Tariff and of the possibility that the tariff rates might be applicable to the LP gas shipments; the very purpose of its arrangement with the Railroad was to attempt to avoid the tariff. Golden Triangle can hardly pose as an innocent shipper led to a railroad slaughter.[3]

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**3.** Note 2 to Rule 6, § 2, of the Maurer Tariff specifies "the charges provided in this rule on shipments held in cars are in addition to the regular demurrage and track storage charges." If the $36 monthly rental agreed upon by the parties was in excess of any regular track storage charges that were applicable to the shipments in question in this case, then Golden Triangle has an action to recover any excess over the charges provided in the tariffs. *See* 49 U.S.C.A. § 6(7); *Chesapeake & Ohio Railway Co. v. Westinghouse, Church, Kerr & Co.,* 1926, 270 U.S. 260, 46 S.Ct. 220, 70 L.Ed. 576. Because the issues were neither raised by the appeal nor briefed we do not discuss some of the questions that might ensue. Indeed, considering the amount involved and the fact that the issue appears to have no future application to their relationship, we trust that the parties may find it expedient to adjust the matter. We mention some of the questions in the tangle that must be unraveled.

First, let us assume that regular storage charges were specified in other tariffs; the question arises whether a claim to recoup was a compulsory counterclaim in this action, and whether, if it was, it should be barred on the basis of res judicata or estoppel. *It is not entirely clear whether res judicata or estoppel bars assertion of a compulsory counterclaim in a subsequent action.* C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1417 at 95–6 (1971). However, we have stated, "[a]lthough the bar resulting from failure to bring a compulsory counterclaim is not identical to the bar of res judicata, our court has held that the 'principles of res judicata' govern."

*Cleckner v. Republic Van & Storage Co., Inc.,* 5 Cir. 1977, 556 F.2d 766, 769 (citations and footnote omitted).

On the other hand, if estoppel is the basis for barring the assertion of such a claim, Golden Triangle should not be barred from asserting its claim, because, as we point out in our opinion, estoppel is generally not a defense to a claim asserted by a *carrier* for the collection of a charge specified in a legally applicable tariff, and the same rule should apply to an action by a *shipper* to recover charges collected by a carrier in excess of applicable tariffs; in both cases the policy of the Interstate Commerce Act to ensure uniform rates would override the normal application of estoppel.

Second, suppose it is shown that the $36 storage charge was not in excess of applicable tariffs, but simply within an area where railroads may freely negotiate with shippers. In that event, Golden Triangle would be barred by res judicata or estoppel from asserting an action to recover the $36 as excessive or unreasonable in the light of the application of the Maurer Tariff, because the claim should have been asserted in this action. F.R.Civ.P. 13(a). Finally, we note that all the equities are not in one side of the balance; Golden Triangle has obtained the benefit of close to a year of shipment storage free from the Maurer Tariff because the three year statute of limitations, 49 U.S.C.A. § 16(3)(a) (Supp.1978), barred recovery by the Railroad for most of the first year of operation of the lease.