TADMS, INC., Plaintiff,

v.

CONSOLIDATED
FREIGHTWAYS, Defendants.

TADMS, INC., Plaintiff,

v.

WATKINS MOTOR LINES,
INC., Defendant.

TADMS, INC., Plaintiff,

v.

PACIFIC INTERMOUNTAIN EXPRESS
CO., Ryder Truck Lines, Inc.,
Defendants.

Nos. 83–2879 BG (Bx), 83–4008 RG (Bx)
and CD–84–1250 BG (Bx).

United States District Court,
C.D. California.

Aug. 16, 1985.

Marken, Parsons & Anderson, Los Angeles, Cal., for plaintiff TADMS, Inc.

Christopher Ashworth, Scott J. Tepper, Garfield, Tepper & Ashworth, A Professional Corp., Los Angeles, Cal., for defendant Watkins Motor Lines, Inc.

Robert W. Hancock, Russell & Hancock, Los Angeles, Cal., for defendant Ryder/P.I.E. Nationwide, Inc.

## MEMORANDUM

GADBOIS, District Judge.

This court, having read and considered the stipulated set of facts and all written material offered by the parties in support of their positions in this case, and having heard and considered the oral arguments of the parties in support of their positions, orders that judgment be entered in favor of the defendants and that the plaintiff take nothing.

### BACKGROUND:

This case comprises three consolidated cases that were submitted for consideration and decision by this court on a stipulated statement of facts. This stipulation of facts, with a few important additions, is set forth below virtually verbatim:

### INTRODUCTORY FACTS

This case involves the interpretation of a single item contained in the tariffs of the defendant carriers. The issue in the case is whether or not a tariff printing error has resulted in plaintiff's right to a lower freight charge for certain transportation services. If the plaintiff is correct, then it is entitled to the amounts prayed for in the complaints. If the plaintiff is not correct, it is entitled to nothing. In simple words this is an all or nothing case.

The following facts are established:

1. At all times relevant hereto, defendant, Consolidated Freightways (hereinafter "CF"), was and is a motor common carrier and at all times was acting within the scope of the authority issued to it by the Interstate Commerce Commission ("ICC").

2. At all times relevant hereto, defendant, Watkins Motor Lines, Inc. (hereinafter "Watkins"), was and is a motor common carrier and at all times was acting within the scope of the authority issued to it by the ICC.

3. At all times relevant hereto, Pacific Intermountain Express Co. ("PIE") and Ryder Truck Lines, Inc. ("Ryder"), were motor common carriers and at all times were acting within the scope of the authority issued to them by the ICC. On or about June 11, 1983, PIE and Ryder were merged, and the surviving corporation and the successor in interest to the rights and the liabilities of PIE and Ryder is defendant Ryder/PIE Nationwide Inc. ("Ryder/PIE"), a motor common carrier operating within the scope of authority issued to it by the ICC.

4. At all times relevant hereto, defendants, CF, Watkins, and Ryder/PIE were authorized to transport commodities in in-

terstate commerce described in Item No. 84260 of the National Motor Freight Classification which are described as follows:

"Games and toys N.O.I."

5. At all times relevant hereto, defendants CF, Watkins, and Ryder/PIE were participating carriers in the following tariff publications:

a. National Motor Freight Classification 100 Series, Item No. 84260;

b. Tariff I.C.C. RMB 226–A, published by Rocky Mountain Motor Tariff Bureau, Inc.;

c. Tariff I.C.C. RMB 120 series, published by Rocky Mountain Motor Tariff Bureau, Inc.

6. The shipments which are the subject matter of this action originated at the following points:

a. Whamo Mfg.—San Gabriel, California;

b. Revelle, Inc.—Venice, California;

c. Placo Products Company—Torrance, California;

d. Tomy Corporation—Carson, California.

7. San Gabriel, Venice, Torrance and Carson, California, are western territory points listed in Tariff I.C.C., RMB 120.

8. Tariff I.C.C., RMB 120 assigns group number w800 to western territory points in, *inter alia,* San Gabriel, Venice, Torrance and Carson, California.

9. The destinations for the shipments which are the subject matter of this action are eastern territory points listed in Tariff I.C.C., RMB 120.

10. Eastern territory points which are the subject matter of this action are assigned group numbers from 2000 through 8854. There were no shipments to eastern groups 8855 through 9675. The western and eastern geographical groups which are of concern to this litigation are as set forth in RMB 120, Item No. 201 as follows:

rules

GROUP COVERAGE—APPLICATION OF

(1) Opposite each point named in either Section 3 or Section 4 of this tariff a group number is provided. Rates or charges named in this tariff or named in tariffs made subject to this tariff are shown as applicable either from and to specifically named points, or from and to group numbers. Where the latter is the case, the group numbers referred to are those shown in Section 3 or 4 of this tariff.

(2) Group numbers used for points in Western Territory named in Section 3 of this tariff are numbers W100 thru W998. The states in which such group numbers are used are indicated below:

| Western Groups | States in Which Used | | Western Groups | States in Which Used | |
|---|---|---|---|---|---|
| W100 thru W199 | Montana | Wyoming | W600 thru W698 | Arizona | Utah |
| | | | | Colorado | Wyoming |
| W200 thru W398 | British | Idaho | | Nevada | |
| | Columbia | Oregon | | | |
| | California | Washington | W700 thru W798 | Arizona | |
| W400 thru W598 | Idaho | Oregon | W800 thru W899 | California | Nevada |
| | Montana | Utah | | | |

(3) Group numbers used for points in Eastern Territory named in Section 4 of this tariff are numbers 2000 thru 9699. The states in which such group numbers are used are indicated below:

| Eastern Groups | States in Which Used | | Eastern Groups | States in Which Used | |
|---|---|---|---|---|---|
| 2000 thru 2099 | Colorado | Wyoming | 7500 thru 7899 | Connecticut | New Hampshire |
| | Nebraska | | | Delaware | New Jersey |
| | | | | District of | New York |
| 2100 thru 2199 | Nebraska | Wyoming | | Columbia | Pennsylvania |
| | | | | Kentucky | Rhode Island |
| 2200 thru 2299 | Colorado | Nebraska | | Maine | Vermont |
| | Kansas | | | Maryland | Virginia |
| | | | | Massach. | West Virginia |
| 2300 thru 2699 | Kansas | Nebraska | | | |
| 2700 thru 2999 | Iowa | Missouri | 8000 thru 8199 | Florida | S. Carolina |
| | Kansas | Nebraska | | Georgia | Tennessee |
| | | | | N. Carolina | Virginia |

| | | | | | |
|---|---|---|---|---|---|
| 3000 thru 3499 | Iowa<br>Minnesota<br>Nebraska | N. Dakota<br>S. Dakota | 8200 thru 8399 | Alabama<br>Florida<br>Georgia<br>Kentucky | N. Carolina<br>Tennessee<br>Virginia |
| 3500 thru 3599 | Minnesota | Wisconsin | | | |
| 3600 thru 3699 | Michigan<br>(Upper) | Wisconsin | 8400 thru 8799 | Alabama<br>Florida<br>Georgia<br>Kentucky | Louisiana<br>Mississippi<br>Tennessee |
| 4000 thru 4899 | Illinois<br>Iowa | Minnesota<br>Missouri<br>Wisconsin | | | |
| 5000 thru 5099 | Illinois | | 8800 thru 8854 | Kentucky<br>Louisiana | Mississippi<br>Tennessee |
| 5200 thru 5899 | Illinois<br>Indiana | Wisconsin | 8855 thru 8999 | Arkansas<br>Louisiana | Mississippi<br>Tennessee |
| 6000 thru 6299 | Indiana | Kentucky | 9000 thru 9299 | Arkansas<br>Louisiana | Oklahoma<br>Texas |
| 6300 thru 6899 | Indiana<br>Kentucky | Michigan<br>Ohio | 9300 thru 9675 | Oklahoma | Texas |
| 7000 thru 7399 | Kentucky<br>New York<br>Ohio | Pennsylvania<br>West Virginia | | | |

---

11. Tariff I.C.C., RMB 226–A, Item No. 3925 provides rates for games or toys N.O.I. between the points which are the subject matter of this action. As of March 16, 1980 (prior to the tariff printing error), the portions of Item No. 3925 which are of concern here were set forth as follows:

| articles | | | | | | | | | Item |
|---|---|---|---|---|---|---|---|---|---|

GAMES OR TOYS GROUP:

3925 continued

As described in Item 3925 on Page 1108-A series.

| from | to | rate | min. wt. (pounds) | | from | to | rate | min. wt. (pounds) |
|---|---|---|---|---|---|---|---|---|
| W800, City of Industry (Industry), CA, Garden Grove, CA or Santa Ana, CA | 2000 thru 2049 | 1600 1459 1317 1242 | 500 1,000 2,000 5,000 | | W800 City of Industry (Industry), CA, Garden Grove, CA or Santa Ana, CA | 8000 thru 8177 | 2851 2640 2376 2243 | 500 1,000 2,000 5,000 |
| | 2050 thru 3499 | 1641 1577 1424 1347 | 500 1,000 2,000 5,000 | | | 8200 thru 8397 or 8399 | 2444 2257 2029 1921 | 500 1,000 2,000 5,000 |
| | 3500 thru 3529 | 1776 1624 1462 1383 | 500 1,000 2,000 5,000 | | | 8400 thru 8484 or 8486 thru 8799 | 2181 2007 1809 1709 | 500 1,000 2,000 5,000 |
| | 3530 thru 3999 | 1826 1672 1506 1423 | 500 1,000 2,000 5,000 | | | 8800 thru 8847 | 1841 1689 1518 1438 | 500 1,000 2,000 5,000 |
| | 4000 thru 4624 | 1782 1632 1468 1387 | 500 1,000 2,000 5,000 | | | 8848 | 1780 1629 1465 1385 | 500 1,000 2,000 5,000 |
| | 4625 thru 4899 | 1729 1577 1468 1347 | 500 1,000 2,000 5,000 | | | 8850 thru 8854 | 1825 1671 1505 1422 | 500 1,000 2,000 5,000 |
| | 5000 thru 5099 | 1825 1671 1505 1422 | 500 1,000 2,000 5,000 | | | 8855 thru 9675 | 1780 1629 1465 1385 | 500 1,000 2,000 5,000 |
| | 5200 thru 5899 | 1856 1703 1535 1448 | 500 1,000 2,000 5,000 | | W800 thru W813 | 8178, 8188, 8189, 8192, 8196 or 8197 | 3364 2997 2586 2372 | 500 1,000 2,000 5,000 |
| | 6000 thru 6899 | 2181 2007 1809 1709 | 500 1,000 2,000 5,000 | | | 8178, 8188, 8189, 8192, 8196 or 8197 | 2477 2398 2159 2099 | 500 1,000 2,000 5,000 |
| | 7000 thru 7399 | 2147 2125 1914 1811 | 500 1,000 2,000 5,000 | | Santa Ana, CA | 8178 thru 8199 | 3823 | 500 |
| | 7500 thru 7899 | 2599 2399 2162 2043 | 500 1,000 2,000 5,000 | | | | 3407 | 1,000 |
| | | | | | | | 2938 | 2,000 |
| | | | | | | | 2698 | 5,000 |

---

Focusing on the eastern group Nos. 8855 through 9675, on May 10, 1980 (again, prior to the printing error), groups 8855 through 9675 appeared in the tariff as follows:

| 8855 thru 9675 | 1821 | 500 |
|---|---|---|
| | 1666 | 1,000 |
| | 1499 | 2,000 |
| | 1417 | 5,000 |

On December 20, 1980 through a publishing error, the material formerly denominated "8855 through 9675" appeared as follows:

| 855 thru 9675 | 2096 | 500 |
|---|---|---|
| | 1919 | 1,000 |
| | 1726 | 2,000 |
| | 1571 | 5,000 |

That publication error persisted until July 6, 1981, at which time the section again read as follows:

| 8850 thru 8854 | 2150 | 500 |
|---|---|---|
| | 1968 | 1,000 |
| | 1773 | 2,000 |
| | 1613 | 5,000 |

12. The rates applied by defendants and paid by the shippers are found in Item 3925.

13. The shipments which are the subject matter of this action originated at western group W800 and were destined to points and places in eastern groups 2000 through 8854. There were no shipments to eastern groups 8855 through 9675.

14. Rocky Mountain Tariff Bureau issued revised tariff pages on Item No. 3925 of I.C.C. RMB 226–A which contained a publication error. [See paragraph 11 hereof.]

15. During the time of the shipments the tariff page containing the publication error was in effect.

16. The publication error set out rates for the shipments which are lower than the rate applied and the charges collected by CF, Watkins and Ryder/PIE.

17. The right to recover for overcharges on the shipments has been assigned to the plaintiff, TADMS, Inc.

18. The publication errors, if found to apply, would result in lower rates and charges. In such a case, the plaintiff would be entitled to a refund in the amount alleged in the complaints on file herein.

ANALYSIS:

I. THE LEGAL STATUS OF TARIFFS.

█ It is well settled that a tariff has the force of law and that a shipper and a carrier are bound by its terms and cannot vary those terms. *Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939); *Farley Terminal Co. v. Atchison, Topeka and Santa Fe Railway*, 522 F.2d 1095, 1098 (9th Cir.1975); *accord Blanchette v. Hub City Terminals, Inc.*, 683 F.2d 1008, 1009 (7th Cir.1981). This is a strict rule. As the United States Supreme Court noted in an early decision:

> Deviation from [the fixed rate] ... is not permitted upon any pretext. Shippers ... are charged with notice of it, and they, as well as the carrier, must abide by it.... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress.

*Louisville & Nashville Railroad v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).

█ The published tariff must be followed even if a shipper was quoted a different price by a carrier, *Maxwell*, 237 U.S. at 97, 35 S.Ct. at 495; *Illinois Central Gulf Railroad v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588, 592 (5th Cir. 1978), or even if there exists a contract providing for shipment at a different rate or price. *Texas & Pacific Railway v. Mugg & Dryden*, 202 U.S. 242, 245, 26 S.Ct. 628, 630, 50 L.Ed. 1011 (1906); *Illinois Central Gulf Railroad*, 586 F.2d at 592. Individual hardship is not a defense to the application of published tariffs. *New York Central & Hudson River Railroad v. York & Whitney Co.*, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016 (1921); *Illinois Central Gulf Railroad*, 586 F.2d at 592. Finally, equitable considerations cannot justify departure from published tariffs. *Chicago & North Western Railroad v. Union Packing Co.*, 514 F.2d 30, 32 (8th Cir.1975); *Illinois Central Gulf Railroad*, 586 F.2d at 592.

II. MISTAKES AND CLERICAL ERRORS IN PUBLISHED TARIFFS.

Relevant here is the rule that a mistake in the publication of a tariff rate, even a plain clerical error, does not justify or permit departure from a published tariff, even though shippers had full knowledge of the mistake and took advantage of it. In an early decision, *Lamb-Fish Lumber Co. v. Yazoo & Mississippi Valley Railroad Co.*, 42 I.C.C. 470 (1916), the ICC concluded that a publication error does not justify departure from the published rates, even though the shippers had full knowledge of the error and took advantage of it. And in a later decision, *Pittsburgh Plate Glass Co. v. Baltimore And Ohio Railroad*, 305 I.C.C. 479 (1958), the ICC stated:

> Other than the error in publication, no evidence was offered to show that the assailed rate was inapplicable. The tariff in effect when the shipment moved was binding upon the carrier and shipper alike and an error in the publication of a

rate therein affords no legal ground for a departure from the tariff provisions. *Id.* at 480.

Courts likewise have found that a publication error does not justify departure from a published tariff. Neither the Supreme Court nor the United States Court of Appeals for the Ninth Circuit has addressed directly this issue. However, in *Davis v. Portland Seed Co.*, 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762 (1924), the Supreme Court, discussing in *dicta* the "imperative requirements concerning publication of rates and subsequent observance of them," cited the ICC's decision in *Lamb-Fish Lumber* with apparent approval, stating: "The Commission holds, for example, that although the schedule contains a plain clerical error, nevertheless no other charge may be demanded and the shipper may recover any excess." *Id.* at 424, 44 S.Ct. at 384 (citing *Lamb-Fish Lumber* ).

Although, as noted, the Supreme Court's comment in *Davis* was dictum, lower federal courts have held that a publication error does not justify departure from a published tariff. In *Armour & Co. v. Atchison, Topeka & Santa Fe Railway*, 254 F.2d 719 (7th Cir.1958), a clerical error resulted in the publication of a tariff rate that was improperly low. A shipper, aware of this error, initially paid the higher rate but later sued the carrier for reimbursement on the ground that the published rate, although erroneous, nevertheless was the legal rate and was binding on the parties. In affirming a judgment for the plaintiff shipper, the Seventh Circuit concluded: "A mistake in the publication of a rate in a tariff schedule is no justification for a departure from the published tariff." *Id.* at 723–24. In reaching this conclusion, the Seventh Circuit relied heavily upon the ICC's decision in *Lamb-Fish Lumber* discussed above. *Id.* at 724.

Similarly, in *Beaument, Sour Lake & Western Railway v. Magnolia Provision Co.*, 26 F.2d 72 (5th Cir.1928), a carrier mistakenly published a tariff rate of twenty-three cents per hundredweight but it continued to charge shippers seventy cents per hundredweight, which was the rate it had intended to publish. The shippers sued to recover the difference between the erroneously low, published rate and the proper but higher rate they were charged. In affirming a judgment for the shippers, the Fifth Circuit relied upon *Lamb-Fish Lumber* for the proposition that "proof of error in the publication of rates does not justify a departure from the published rates, even though shippers have full knowledge that the rates were published by mistake." *Id.* at 73; *see National Van Lines v. United States*, 355 F.2d 326, 331 (7th Cir.1966) ("Inadvertent mistake provides no excuse for a deviation" from a published tariff.).

Federal district courts that have confronted the issue have reached the same conclusion as the Fifth and Seventh Circuits, holding that a publication error does not justify departure from a published tariff. *See, e.g., United States v. Seatrain Lines, Inc.*, 370 F.Supp. 483, 484 (S.D.N.Y. 1973) (the published "rate must be charged and paid regardless of seemingly innocent justifications for departure such as mistake, inadvertence or contrary intention of the parties"); *United States v. Pan American Mail Line, Inc.*, 359 F.Supp. 728 (S.D. N.Y.1972) (same).

## III. AMBIGUITY IN PUBLISHED TARIFFS.

The foregoing discussion makes clear that a mistake or a clerical error in a published tariff does not justify or permit departure from that published rate. A court is obligated to enforce the published rate between carriers and shippers regardless of the equities and hardships involved. Quite a different situation is presented, however, when a tariff is not totally wrong but merely is ambiguous. *See National Van Lines*, 355 F.2d at 332 (Noting that the "inadvertent omission" of a brief note in a tariff "does not *ipso facto* change the meaning of the tariffs. At most, it creates an ambiguity or uncertainty.") When a tariff is ambiguous a court may interpret it unless the doctrine of primary jurisdiction applies. *United States v. Western Pacific*

*Railroad,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Under the primary jurisdiction doctrine, a claim relating to an ambiguous tariff must be pursued at the ICC before resort to a judicial remedy if the words in dispute "are used in a peculiar or technical sense" or if resolution of the dispute depends on a factual inquiry into technical matters within the ICC's domain of expertise. *Id.* at 63–70, 77 S.Ct. at 164–68. In order to interpret ambiguous tar-, iffs falling outside the primary jurisdiction doctrine, the courts have developed well-recognized rules of construction.

▮▮▮ The threshold question of whether or not a tariff is ambiguous is a question of law. *See Western Transportation Co. v. Wilson and Co.,* 682 F.2d 1227, 1230 (7th Cir.1982); *National Van Lines,* 355 F.2d at 332. If the court determines that the tariff is ambiguous, the interpretation and construction of that tariff also ordinarily presents a question of law for the court. *United States v. Western Pacific Railroad,* 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956); *Union Pacific Railroad v. Ore-Ida Potato Products,* 252 F.2d 505, 507 n. 5 (9th Cir.1958).

▮▮▮ An ambiguous tariff should be construed according to general principles of contract law. *Western Transportation Co.,* 682 F.2d at 1231; *Penn Central Co. v. General Mills, Inc.,* 439 F.2d 1338 at 1340 (8th Cir.1971). In interpreting an ambiguous tariff, its words and symbols should be construed in the sense in which they generally are used. *Coca Cola Co. v. Atchison, Topeka & Santa Fe Railway,* 608 F.2d 213 at 220 (5th Cir.1979); *Penn Central Co.,* 439 F.2d at 1340–41.

▮▮▮ A tariff generally is strictly construed against the carrier because the carrier drafted it, and consequently any ambiguity or doubt is resolved in favor of the shipper. *Coca Cola Co.,* 608 F.2d at 221; *Penn Central Co.,* 439 F.2d at 1341.

▮▮▮ A tariff, however, should be interpreted to avoid unjust, absurd, or improbable results. *Glickfeld v. Howard Van Lines,* 213 F.2d 723, 726–27 (9th Cir.1954);

*accord Coca Cola Co.,* 608 F.2d at 221; *Penn Central Co.,* 439 F.2d at 1341. In this regard, "a strict construction of a tariff against a carrier is not justified where such a construction ignores a permissible and reasonable construction which conforms to the intentions of the framers of the tariff, avoids possible violations of the law, and accords with the practical application given by shippers and carriers alike." *Penn Central Co.,* 439 F.2d at 1341; *Coca Cola Co.,* 608 F.2d at 221.

▮▮▮ Furthermore, in interpreting an ambiguous tariff, a court must consider the tariff as a whole, not just a particular provision. *Western Transportation Co.,* 682 F.2d at 1230; *Southern Pacific Transportation Co. v. United States,* 596 F.2d 461, 464, 219 Ct.Cl. 540 (1979); *Southern Pacific Co. v. Lothrop,* 15 F.2d 486, 487 (9th Cir.1926). Finally, a court should avoid interpreting a tariff in a manner that would nullify specific or substantial tariff provisions. *Lothrop,* 15 F.2d at 487; *accord Southern Pacific Transportation Co.,* 596 F.2d at 464–65.

## IV. THE CASE AT HAND.

The tariff at issue in the case at hand defines shipping rates for the shipment of certain games and toys from a particular geographic region in the western United States labeled western group W800 to numerous destinations in the eastern United States. The shipping destinations in the eastern United States are assigned group numbers from 2000 through 9675. The shipping rate per pound from western group W800 varies depending on what assigned group the particular destination falls in. The differences among these shipping rates presumably reflect different distances and different costs per mile for a given shipment.

▮▮▮ From December 20, 1980 to July 6, 1981, the tariff at issue contained a publication error. One particular provision in that tariff should have stated the shipping rate from western group W800 to destinations in eastern groups "8855 thru

9675." Instead, the publication printed a reference to destinations in eastern groups "855 thru 9675." The error was a missing numeral "8." A glance at that tariff, however, which consists of a single page, reveals two relevant facts: (1) there is no eastern group *855*. As the defendants correctly point out, this is a nonexistent geographical region encompassing nonexistent destinations. In fact, as noted earlier, eastern groups begin with eastern group 2000; and (2) all the other provisions of that tariff provide the shipping rates from western group W800 to destinations in eastern groups 2000 through 8854.

The case at hand involves shipments from western group W800 to eastern groups *other than* eastern groups 8855 through 9675. If the provision containing the publication error during the period in question applies to all shipments covered by the tariff from western group W800 to all destinations in eastern groups 2000 through 9675 (which includes *all* eastern groups), the plaintiff should have been charged lower shipping rates than it was charged and thus is entitled to a refund. Naturally, the plaintiff argues that this is the proper interpretation of the tariff. It contends that the tariff clearly provides that the provision in question applies to all shipments from western group W800 to eastern groups *855* through 9675 and that the publication error cannot justify any other interpretation of the tariff. In support of its argument, the plaintiff relies on the line of cases discussed above that holds that a publication error does not justify departure from a published tariff.

The defendants, not surprisingly, disagree with the plaintiff's interpretation of the tariff. They concede, as they must, that the particular provision in question did contain a publication error. They contend, however, that the publication error created an ambiguity. They argue that in resolving this ambiguity, this court should consider the tariff as a whole and that when the tariff is viewed in its entirety the interpretation proffered by the plaintiff is unjust, absurd, and improbable. For reasons discussed below, this court agrees with the

defendants as to the proper interpretation of the tariff in question.

Before proceeding, this court notes that it is competent to resolve this dispute because the doctrine of primary jurisdiction, which requires preliminary resolution of certain disputes by the ICC, is inapplicable to the case at hand. This doctrine does not apply because this dispute involves neither words nor symbols used in a peculiar or technical sense nor a factual inquiry into technical matters within the ICC's domain of expertise. Rather, this dispute involves a publication error that is understood easily by laymen.

Now, turning to resolution of this dispute, the first issue confronted is whether this tariff is ambiguous. The publication error made the tariff ambiguous for two reasons. First, the provision containing the error appeared to state the shipping rates from western group W800 to eastern groups *855* through 9675. In fact, the lowest numbered eastern group is eastern group 2000. Thus, the meaning of this particular provision clearly is ambiguous. Second, the page upon which the publication error appeared provided the shipping rates from western group W800 to all eastern groups, which includes eastern groups 2000 through 9675. The other tariff provisions on this tariff page would conflict with the provision containing the error if that provision is interpreted to define the shipping rates to all eastern groups. Thus, the meaning of the tariff as a whole is ambiguous.

Plaintiff relied on cases that hold that publication errors in published tariffs do not justify departure from the published rates. Because the tariff is ambiguous, this line of cases is irrelevant here. That line of cases is relevant only when the tariff (whether correct or erroneous) is *unambiguous*. *See Western Transportation Co.*, 682 F.2d at 1231 ("If [a tariff] is ambiguous, it should be construed like any other contract. But if it is unambiguous, the parties are bound by its terms and the aids to construction are irrelevant."); *Na-*

**394**

*tional Van Lines*, 355 F.2d at 332 (if an "inadvertent omission" in a tariff creates "an ambiguity or uncertainty ... the traditional rules of construction of written instruments are controlling in arriving at the proper application of the tariffs"). The cases relevant to resolving the matter before this court are those cases discussed above that define the general rules of construction for interpreting ambiguous contracts. In short, this court must apply these rules of construction to the case at hand.

Application of these rules of construction to the case at hand leaves no doubt that this case must be resolved in favor of the defendant carriers. The plaintiff's interpretation of the tariff would produce unjust and absurd results. Viewing the tariff as a whole, it is clear that any reasonable shipper—and probably any unreasonable and gullible shipper as well—should have been aware of the mistake in the particular provision in question and should have been aware that the correct shipping rates were stated on the same tariff page. Accepting the plaintiff's interpretation of this tariff would require this court to conclude that the shipping rates from western group W800 to all eastern groups were stated in the one particular tariff provision in question. The plaintiff's interpretation of the tariff also would require this court to ignore the fact that although the lowest numbered eastern group is eastern group 2000, the particular provision in question appeared to state shipping rates to eastern groups beginning with eastern group 855, which is a nonexistent geographic region. Finally, the plaintiff's interpretation of the tariff in question would require this court to ignore all other provisions of the tariff except the particular ambiguous provision and would render the other provisions nugatory and superfluous.

Thus, this court holds that the proper interpretation of the tariff in question is that the shipping rates from western group W800 to eastern groups 2000 through 8854 are correctly provided for in all the provisions of the tariff other than the provision containing the error. Whether the tariff provision containing the error is nugatory or whether it provides the shipping rates from western group W800 to eastern groups *8855* through 9675 is irrelevant because this case does not involve any shipments to eastern groups 8855 through 9675. The mistake in that particular provision has no effect on the other provisions of this tariff and that is all that is important. Judgment for the defendants will be entered accordingly. Counsel for Consolidated Freightways, Watkins, and Ryder/PIE will work together in preparing and serving a form of judgment.