CHEHARDY, Chief Judge.
Associated Moving & Storage Company, Inc., appeals an adverse judgment against it regarding its charges on a contract for moving services. Frotscher Steckler, the plaintiff, alleged that he hired Associated to move his household from New Orleans, Louisiana, to Austin, Texas, for the price of $2,800. Upon arrival in Austin, the movers billed Steckler $6,128.71 and refused to release his furniture until he paid. Steckler filed suit to recover the amount paid in excess of $2,800. Steckler also named United Van Lines a defendant, but United was dismissed prior to trial.
The trial judge concluded that no binding estimate had been confected, but accepted as the figure agreed between the parties the final estimate given by Associated’s representative, in the amount of $3,900. He also found Associated was entitled to $907.55 for additional services provided during the move. Accordingly, he ruled that Steckler was entitled to recover $1,321.16.
Associated has appealed, arguing it is bound by the Interstate Commerce Commission tariffs and cannot contract for a price different than the rates established by tariff. Associated contends it is a motor carrier licensed by the Interstate Commerce Commission and that it shipped the merchandise by weight under Tariff No. 400B, Section 3.
The Interstate Commerce Act states that a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission may not charge or receive a different compensation than the rate specified in the applicable tariff, “whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.” 49 U.S.C. § 10761(a). The long-established principles of law interpreting this rule, stated in numerous federal cases, were aptly summarized in Ill. Cent. Gulf R. Co. v. Golden *135 Triangle, etc., 586 F.2d 588, 592 (5 Cir. 1978):
“The Interstate Commerce Act was designed to provide uniformity in charges for services, and, thereby, to prevent rate discrimination. * * * If a carrier could modify its tariffs without filing a new tariff, it could engage in rate discrimination. Similarly, to permit a party to invoke estoppel in cases in which a recipient of services covered by a tariff was promised a different charge for those services would undermine the policy of uniformity in charges that underlies the Interstate Commerce Act; it would be possible for rate discrimination to occur through the subterfuge of a carrier’s deliberately misinforming a shipper as to the proper charges for services to be rendered.
“Therefore, filed tariffs have the force of law * * * and establish the liability of a recipient of services covered by the tariff, even if the recipient was quoted a different price * * * or was party to a contract under which the services were to be provided at a different price * * *. A carrier cannot waive or modify legally applicable tariffs * * * and individual hardship is not a defense to the application of such tariffs. * * * Equitable considerations cannot justify a carrier’s failure to collect authorized tariff charges * * *, nor can they be invoked as the basis for an estoppel to collect such charges. * * *
“[A] shipper ‘must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by tariff.’ * * * Filed tariffs are public information * * * of which shippers should be aware. Shippers need not rely on the charges quoted by carriers; they may check the filed tariffs to ascertain the cost of services that they desire. Although reviewing filed tariffs may be burdensome to shippers, to permit a tariff to be avoided when the railroad knows of its applicability and the shipper does not would foster the evil of rate discrimination that the Interstate Commerce Act was designed to eliminate. * * * ” (Citations omitted.) 586 F.2d, at 592.
As stated in Western Transp. Co. v. Wilson and Co., Inc., 682 F.2d 1227 (7 Cir.1982), this is a harsh rule. Particularly when construed against the private noncommercial shipper — who will be far less likely than a commercial shipper to know about tariffs — it offers little protection against carriers who may deliberately misquote rates in order to obtain business and who may fail to provide the private shipper with appropriate information about his rights under the law.
Our review of the jurisprudence reveals no substantive exception that would be applicable here. Apparently the only remedies a shipper has against a carrier who has misquoted rates lie under 49 U.S.C. §§ 11901-11917, which prescribe civil and criminal penalties for violations of the Interstate Commerce Act or of orders of the Interstate Commerce Commission.
Although the substantive law is adverse to the plaintiff, we affirm the decision of the district court on an evidentiary basis. Associated’s assertion of the applicability of the I.C.C. tariffs is an affirmative defense, for which Associated bore the burden of proof. Although the defendant contends that the rates on the bills of lading are those prescribed by tariff, it presented no evidence to support that claim. The defendant failed to introduce any documents to establish what the applicable tariff is, what routes and services it covers, or that it applies by its internal definitions to the transaction here.
Under LSA-C.C.P. art. 1393, official records, regulations, reports, rulings, decisions or other official acts of any commission or agency of the United States may be evidenced by an authorized publication of the United States Government Printing Office. In order for a court to apply a government agency’s regulation, ruling, etc., the court must be informed of it in the appropriate manner; such an official record is not included in the matters of which a court may take judicial notice. See LSA-C.C.P. art. 1391; Washington v. Dairyland Insurance Company, 240 So.2d 562 (La.App. 4 Cir.1970). Defendant failed to submit any such evidence, therefore its *136 affirmative defense regarding the I.C.C. tariff was not proven.
Being thus precluded from considering the tariff rates, we conclude the judgment is otherwise correct because it is based primarily on credibility determinations by the trial judge and we find no manifest error in his conclusions.
Mrs. Steckler testified that she and her husband met Melvin Richoux, an employee of Associated, at a party in March 1981. Mr. Steckler, aware he would be transferring to a new job in Austin, had a long conversation with Mr. Richoux concerning the proposed move. According to Mrs. Steckler, Richoux told them a fair, average price to move a three-bedroom home, would be around $2,500. He told them that by doing the packing themselves they could cut costs. Richoux was informed that Mr. Steckler’s new employer would pay the cost of the move.
Mrs. Steckler said that in April or May, after her husband was already in Texas, Mr. Richoux came to the house to inventory the items to be moved, at which time she told him her husband’s new employer had agreed to give the Stecklers $2,700 toward the moving costs. She stated that Richoux told her, “No problem, I am sure we can do it for that.” Following this her family began packing ahead of time, storing some furniture and household items at other locations and moving some items to Austin themselves beforehand.
The date finally set for their move was December 2, 1981. Mrs. Steckler notified Mr. Richoux about two weeks ahead of time; Richoux said nothing further regarding the price of the move. Asked whether Richoux ever indicated to her that the cost of the move depended on the weight and the distance of the move, she said, “No, not really.” She said she relied on the $2,700 figure he had given her, because he was “a very good friend of a very good friend” of hers and, in addition, her husband knew the owner of the company. For these reasons, the Stecklers had not sought information for other movers.
Mrs. Steckler said she received a booklet about how to pack, but denied that Richoux ever gave her any information explaining how the costs of the move would be calculated. The day before the move she telephoned to request assistance with final packing and Associated sent out three movers, who packed lamps, mirrors and clothing, and began loading the truck. Later that afternoon they told her they could not fit everything on the truck and needed a second van. She spoke by telephone to someone in the Associated office, who told her the second van would cost an additional $500. Associated sent out the second truck and the movers completed their loading the next day. The following day the trucks drove to Austin. Upon arrival, the drivers presented her with a bill of lading in the total amount of $6,128.71.
Mr. Richoux’s testimony differed most materially from Mrs. Steckler’s on the issues of whether he advised her the cost would depend on the weight of the shipment and the distance to be traveled and that those rates are set by the Interstate Commerce Commission. He testified he informed the Stecklers of these facts; the Stecklers flatly denied that and denied ever receiving the informational pamphlet Ri-choux said he always gave customers regarding these matters.
Mr. Steckler’s testimony was more limited than Mrs. Steckler’s, because he had fewer dealings with Mr. Richoux, but its gist established that Richoux assured the Stecklers the move could be made for the figures he estimated.
The trial judge obviously concluded Ri-choux had failed to inform the Stecklers of the manner in which rates for interstate carriage of goods are calculated and had led them to believe the move would be accomplished for an amount close to the figures he mentioned to them. As stated above, this is a credibility determination and we find no clear error.
For the foregoing reasons, the judgment of the district court is affirmed. Appellant is to pay the costs of this appeal.
AFFIRMED.